*In re* APRIL C. *et al.*, Minors and Respondents-Appellees (The People of the State of Illinois, Petitioner-Appellee, v. Ernie C., Respondent-Appellant).

First District (2nd Division)    No. 1—99—2593

Opinion filed November 6, 2001.

Rita A. Fry, Public Defender, of Chicago (Denise R. Avant, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Nancy Grauer Kisicki, and Peter Maltese, Assistant State's Attorneys, of counsel), for the People.

Patrick T. Murphy, Public Guardian, of Chicago (Charles P. Golbert and Deborah Pergament, of counsel), guardian *ad litem*.

JUSTICE McBRIDE delivered the opinion of the court:

The State filed petitions to adjudicate minors April C., Amy C., and Anna C., wards of the court. The circuit court found the minors were abused pursuant to the Juvenile Court Act of 1987 (705 ILCS 405/1—1 *et seq.* (West 1998)) due to physical abuse and excessive corporal punishment by their father, respondent Ernie C., and due to a substantial risk of physical injury. A dispositional hearing was held and parents Kathleen C. and respondent Ernie C. were found to be unwilling, unable, and unfit to parent the minors, who were then adjudicated wards of the court. Respondent now appeals, maintaining that the trial court erred in finding him unable, unwilling, and unfit

to parent the minors and erred in allowing certain testimony at the dispositional hearing.[1]

On June 13, 1997, the State filed petitions for the adjudication of wardship regarding respondents 11-year-old April C., 8-year-old Amy C., and 6-year-old Anna C. (collectively, the children or the minors), who had all been taken into custody two days earlier. The petitions alleged that Anna and Amy had been subjected to physical abuse and excessive corporal punishment and were at substantial risk of physical injury. The petition for April alleged that she was at substantial risk of physical injury. A case management conference order dated August 27, 1997, indicates that the parties were granted leave to amend the petition regarding April to add allegations of physical abuse and excessive corporal punishment.

On October 1, 1997, an adjudication hearing was held. At the hearing, the evidence consisted of a stipulation entered into by the parties. Respondent and Kathleen C. were represented by different counsel. According to the stipulation:

1. Respondent and Kathleen C. were the natural parents of April, Amy, and Anna;

2. Respondent and Kathleen C. were custodial at all relevant times;

3. Since September 1996, respondent and Kathleen C. had also had custody of respondent's stepdaughter's children Jacoba, Angelica, and Guandensio;[2]

4. While in the custody of respondent and Kathleen C., Jacoba sustained a fractured transverse left femur;

5. Respondent admitted to forcefully holding Jacoba down on the toilet seat in an effort to potty train him;

6. Respondent and Kathleen C. stated to doctors and nurses at Children's Memorial Hospital that an explanation for the injury could have been that Jacoba fell down a flight of stairs or fell off a toy;

7. If called to testify, Dr. Marianne Radkowski of Children's Memorial Hospital would state that the injury to Jacoba could have occurred during toilet-training if respondent placed his hands on the child's thigh and used an extreme amount of force to push the child on the toilet seat. Dr. Radkowski would further testify that the type of fracture sustained by the child would not occur from falling down the stairs or falling off a toy. Dr. Radkowski would also state that a bone scan was completed and that this was an instance of abuse;

8. A bone scan completed at Children's Memorial Hospital re-

---

[1]Kathleen C. has filed a separate appeal.

[2]It should be noted that the instant appeal concerns only the adjudication of wardship of April, Amy, and Anna.

vealed that Jacoba also had healed fractures to his right radius and ulna;

9. Based on Jacoba's healed fractures, fractured left femur, and lack of a plausible explanation by respondent and Kathleen C., the multidisciplinary team at Children's Memorial Hospital ruled that the findings were consistent with physical abuse;

10. If called to testify, Susan Garner, a social worker at the minors' school, would state that (a) there had been a couple of incidents regarding respondent that had caused her concern; (b) in or about May of 1997, Guandensio came to school with a bloody lip; (c) Kathleen C. told her Guandensio had bitten his lip when respondent forcefully kept the minor on the toilet; and (d) on or about May 21, 1997, respondent was picking Anna up at school when he was observed grabbing her by the neck;

11. If called to testify, Nicholas Conway would state that while speaking with Kathleen C. on June 9, 1997, she told him that respondent had a temper, that she was aware of the neck incident with Anna; and that she had observed respondent holding Guandensio down on the toilet seat, and that it was excessive and was how Guandensio had bitten his lip;

12. April and Amy had made statements that they got whippings from respondent with a belt, board, or a hand when they were in trouble; and

13. The medical records from Mount Sinai for April, Anna, Amy, Guandensio, and Angelica and from Children's Memorial Hospital for Jacoba were entered into evidence.

The parties also stipulated to a finding that April, Amy, and Anna had been physically abused by respondent, had been subjected to excessive corporal punishment, and were at substantial risk of injury.

Based on the stipulated evidence, the court found that April, Amy, and Anna were abused in that they had been physically abused by respondent, subjected to excessive corporal punishment by respondent, and were at substantial risk of physical injury.

A dispositional hearing commenced on March 18, 1999. At the time of the hearing, April was 13, Amy was 10, and Anna was 8 years old. At the dispositional hearing, the following evidence was adduced.

Julie Dvorsky, a licensed clinical social worker with a master's degree in social work, testified that she was employed by Hephzibah Children's Association and had been assigned to work with the C. family since August 21, 1997. The case first came into the system when respondent's grandchild Jacoba was found with a bone fracture. Several older healed fractures were discovered on Jacoba as well. During a home visit in August 1997, respondent explained to Dvorsky that he

was trying to keep Jacoba on a toilet-training seat and heard a crack while pushing down on him.

The Department of Children and Family Services (DCFS) referred the family to receive psychological examinations and a bonding assessment in September 1997. Following the psychological assessment, it was recommended that respondent get individual psychotherapy, vocational training, a bonding assessment, and a neurological evaluation to rule out narcolepsy. It was recommended that Kathleen C. get individual psychotherapy, couples or marital counseling, continue working toward her GED, and join a women's support group.

The September 1997 bonding assessment recommended that the children not return home due to the psychological issues affecting each parent. The assessment noted an apparent lack of emotional "connectedness" between respondent, Kathleen C., and the children. The assessment contained statements made by all three children to the effect that they missed their parents and wanted to return home and noted that the children were respectful of their parents and well-behaved. The assessment described respondent and Kathleen C.'s relationship with each other as being of particular concern due to suspected past physical abuse of Kathleen C. by respondent and noted that Kathleen C. "seemed incapable at the present time [of] modifying her husband's behavior."

Through DCFS, both parents were referred to Mary and Tom Leo and Associates for individual counseling. The issues addressed in therapy included anger management and corporal punishment. Dvorsky acknowledged that up until June 1998, the reports from Mary and Tom Leo and Associates expressed hope that respondent and Kathleen C. would make significant progress in therapy. Dvorsky testified that the hoped-for progress had not occurred. A June 1998 report from Mary and Tom Leo and Associates stated that many of the sessions with respondent and Kathleen C. had been struggles and that both respondent and Kathleen C. seemed to believe that, with the exception of Leroy Yates, a counselor the parents had sought out on their own, all of the professionals involved in the case were part of a conspiracy to prevent reunification with the children. At the time of the hearing, respondent and Kathleen C. were still participating in individual psychotherapy sessions on a monthly basis. The therapists felt the family needed to be involved in family therapy in order to make any further progress.

According to Dvorsky, family therapy was attempted twice. It was first attempted in October 1997, but was discontinued after one month because the therapist felt no progress was being made and that the parents needed to focus on their own individual psychological issues in

that they were coming into the family sessions angry and were not focusing on the goals established in therapy. The therapist told Dvorsky the children were "frozen" during the sessions and unable to speak. The therapist also stated that this was one of the "most concerning" families he had seen.

Family therapy was attempted again in June 1998. The sessions, which included just the children and Kathleen C., were again discontinued after a month because the therapist found Kathleen C. to be "inappropriate." As an example, Dvorsky related that Kathleen C. had walked out of the session while Anna was relating information on a life issue to her. When Kathleen C. reentered the session, the girls "completely shut down." The children refused to bring forth issues to their mother out of fear she would tell respondent, and April threatened to run away rather than attend family therapy sessions. According to Dvorsky, as of the date of the disposition hearing (March 1999), the children were not ready to attempt family therapy again.

Respondent and Kathleen C. attended a parenting class in September 1997. Respondent wore sunglasses and fell asleep during the sessions, but Kathleen C. participated more. Both parents completed the class and further classes were recommended. Respondent and Kathleen C. took a child management class in 1998. According to Dvorsky, that class went better.

Respondent and Kathleen C. participated in a clinical evaluation on November 2, 1998. The psychiatrist was concerned about respondent's ability to parent the children due to psychiatric issues affecting him. The psychiatrist diagnosed Ernie C. as suffering from posttraumatic stress disorder, with a secondary diagnosis of childhood physical abuse and neglect and an antisocial personality disorder with schizotypal features, resulting in social anxiety and problems with interpersonal relationships. The psychiatrist recommended respondent be put on anxiety medication.

In addition, the evaluating psychiatrist noted that Kathleen C. did not acknowledge that physical abuse had occurred in the home. According to the psychiatrist, Kathleen C. "did not acknowledge that there was a substantial likelihood that her husband could have been the perpetrator [of the injury to Jacoba] yet when [respondent] was interviewed separately he readily admit[ted] that he was the perpetrator in this incident." The psychiatrist found Kathleen C.'s evasiveness and denial that respondent could have been the perpetrator to be of concern.

Respondent and Kathleen C. had supervised visitation with the children from August 1997 through December 1998. Initially, both parents, but particularly respondent, would be very hostile and nega-

tive during the visits. Respondent and Kathleen C. would interrogate the children about the foster home and tell the children that the agency was trying to adopt them out and was not working toward returning them home. Kathleen C. in particular would ask questions about the foster home in a sarcastic manner and make negative comments about the foster parents and other children in the home. The children informed Dvorsky that Kathleen C.'s questioning made them uncomfortable. Although Dvorsky acknowledged that Kathleen C. acted more appropriately when respondent was not present at visitation, Dvorsky did not believe Kathleen C. was utilizing any of the knowledge gained from parenting classes in her visits with the children. In November 1997, a Hephzibah employee reported that respondent made an aggressive move toward her and the police were called, resulting in a temporary suspension of visitation.

In December 1998, Hephzibah decided that it would have at least three workers present during each supervised visit because respondent and Kathleen C. were attempting to whisper to the children so that supervisors could not hear and because the children's behavior before and after the visits was causing concern. The children would be angry and break items in the foster home before and after the visits and Amy would wet the bed. During visits, the children were very flat and did not show much emotion. The children were much more talkative both before and after the visits. During visits where only Kathleen C. and the children were present, the children appeared much more comfortable and the interactions more free in nature. Dvorsky had observed some of the visits and had seen the children frightened, especially when respondent had been hostile toward workers. Dvorsky testified that the children's therapist recommended that the children not be returned home and believed the children would make more progress if visitation with the parents were limited further.

Anna, who was eight years old at the time of the hearing, had begun to act out sexually in the foster home in May 1998. She had asked who was going to pat her vagina and who was going to pull the black stuff out of Amy's vagina, and she had masturbated in front of a younger child in the foster home and had attempted to get that child involved in the masturbation. None of the other minors in the foster home had been acting out sexually. Dvorsky acknowledged that there was no evidence that respondent was the perpetrator of sexual abuse toward Anna. Although various reports in the record entered into evidence expressed suspicions that the girls had been sexually abused, there was no evidence of sexual abuse at the time the dispositional hearing commenced.

Dvorsky testified that up until December 1998, the goal of the case was to return the children to the home. In December 1998, the goal was changed to substitute care upon a determination that the home environment was not appropriate.

Dvorsky testified that, in her opinion, respondent and Kathleen C. were not able and fit to parent their children. She testified that she was concerned respondent did not have his anger issues under control and that Kathleen C. did not have the ability to protect the children from him. Respondent had been volatile and threatening during visitation, and Kathleen C. had not attempted to intervene on behalf of the children. In addition, Kathleen C. had not acknowledged the abuse suffered by the children via respondent. Dvorsky testified that she did not believe the children trusted Kathleen C. or felt that she would protect them and keep them safe. In Dvorsky's opinion, it would be in the best interests of the minors if DCFS were appointed with the right to place the children. Dvorsky stated that the children were together in a nonrelative foster home where the foster parent was committed to permanency for the children. Dvorsky recommended that permanency be established in order for the children to feel more safe and stable.

Lysa Seghetti, a DCFS social worker, testified that she had been assigned to the case from the time it came into the system until shortly before the dispositional hearing.

Seghetti referred respondent for domestic violence counseling in January 1999. Respondent informed her that he wanted to confer with his attorney regarding the referral. Seghetti had not heard back from respondent regarding the referral at the time of the disposition hearing. She was also aware of referrals for respondent for a neuro-psychological examination in early 1998 and in December 1998. Respondent had not followed through on the first referral and she did not know if he had followed through on the second. Seghetti referred respondent for a psychiatric follow-up in February 1999. Seghetti had not received any information indicating respondent had followed through on that referral.

Seghetti had contact with respondent's daughter Molly, whose three children were also in the care of respondent and Kathleen C. when the case came into the system. It was Molly's son Jacoba who had sustained a fracture while in the care of respondent and Kathleen C. In December 1998, Molly informed Seghetti that when she was a child, respondent molested her. Later, respondent had intercourse with her. The sexual abuse went on until Molly was an adolescent and left the home. Seghetti found Molly to be credible. Seghetti found the information to be of concern because April, the oldest of respondent

and Kathleen C.'s three children, had told Seghetti that she would run away if family therapy resumed and reported that she had had thoughts of running away since she was five years old. Seghetti testified that when the case first came into the system, the children were sent to the Under the Rainbow Program at Mount Sinai for a five-day evaluation for physical abuse, sexual abuse, and neglect. The children were diagnosed as having been physically abused by respondent. Seghetti acknowledged that the evaluation found no evidence of sexual abuse.

Seghetti testified that at one court hearing, respondent became aggressive with her and she had to summon a sheriff to intervene. On two occasions, respondent told her she was "evil" and "from the devil." Kathleen C. had also accused Seghetti of working with the devil and informed her that Jesus was going to get her.

Seghetti concurred with Dvorsky's recommendation that the State be appointed as guardian for the children. She did not believe it was in the children's best interests to return home to their parents, as she had concerns regarding their safety and whether Kathleen C. could actually protect them from respondent. Finally, she did not believe respondent had received all of the services necessary to make the home environment safe with him present. Seghetti testified that Kathleen C. could probably parent the children in the absence of respondent but she had grave concerns regarding the relationship of respondent and Kathleen C. and Kathleen C.'s ability to sever that relationship.

Tracy Handalman, a DCFS social worker with a master's degree in education and child development, testified that she had been the caseworker for the case involving respondent and Kathleen C.'s three grandchildren since August 1997, and had recently been assigned as the social worker to the instant case involving April, Amy, and Anna. She testified that the foster parent of the grandchildren had told her that respondent had been showing up outside the grandchildren's day care. In one instance, respondent approached the foster parent's car. The foster parent reported that the children had suffered emotional problems after seeing respondent.

Handalman recommended that it would be in the best interest of the children in the instant case to be placed under the guardianship of DCFS. She did not believe it would be in the children's best interests to be in an environment where respondent was living. Her opinion was based on her belief that respondent was the person who broke Jacoba's leg, the allegations of physical abuse against April, Amy, and Anna, and the fear she has seen in both the children and grandchildren regarding respondent.

Molly Ann Ruiz-C., the 28-year-old daughter of respondent, testi-

fied over the objection of the attorneys for both parents. The court, in allowing Molly's testimony, noted that although the evidence was being admitted, it would not consider her testimony if it later proved to be irrelevant or its probative nature was outweighed by its prejudicial nature. Molly testified that when she was around three years old, respondent began to touch her in inappropriate places. He would fondle her, put his fingers in her vagina, and put his penis between her legs and move up and down. This happened a number of times and Molly recalled one instance where it hurt a lot. Molly testified that her mother (who was not Kathleen C.) knew what respondent was doing to her but did nothing about it. Respondent moved out when she was about six years old. Respondent was physically abusive to her, her siblings, and her mother. Respondent would come back for visits after he moved out and would touch her, but, according to Molly, she knew better by then and he would stop.

Molly left home at age 13 and subsequently had 9 children and serious problems with drugs. She was 28 years old at the time of the dispositional hearing and had been drug free for two years. While attempting to recover from her drug problems, she had asked respondent and Kathleen C. to care for her three children Guandensio, Angelica, and Jacoba. At the time, she thought respondent may have changed due to his religious beliefs and she liked Kathleen C. Kathleen C. was not Molly's mother, but she treated the kids like they were her own grandchildren.

The Reverend LeRoy Yates testified on behalf of Kathleen C. that he was a minister, professional counselor at the Westside Holistic Family Center, and had a master's degree in psychotherapy. Kathleen C. and respondent came to him in July 1997 for counseling help. They were not referred to him by DCFS. In counseling, he worked with Kathleen C. in helping her to understand the need to protect the children from respondent in cases where things got out of control. Yates believed that Kathleen C. would be willing to do whatever was necessary to protect the children and testified that she had become more forceful in taking charge of decision-making in the family. He concluded that Kathleen C. had the skills to be a fit parent for the children.

At the request of Lysa Seghetti, Yates prepared progress reports from time to time. She would also notify him when staffings in the case were to take place and he would attend.

Reverend Yates acknowledged that he had met the children only in passing. According to Yates, respondent believed that he accidently injured Jacoba during toilet-training and Kathleen C. was not sure what happened.

Reverend Yates believed that Kathleen C. was much better equipped to take care of the family following therapy, because she had learned to protect the children and to be more "hands-on." He stated that Kathleen C. had acknowledged that respondent had gotten physical with her in the past but he was not aware of any incidents of battery during the period he had been counseling the couple. Yates testified that, in his opinion, a battered woman is someone who has been beaten black and blue or someone who may have fractures. He was not aware that an Under the Rainbow report from June 1997 had described Kathleen C. as someone who appeared to be a battered wife who refused to leave her current situation. Reverend Yates stated that Kathleen C. told him she could manage the family on her own and would leave respondent if necessary.

Reverend Yates stated that he did not believe the children needed to be protected from respondent. Yates had worked with respondent on anger-management issues. Yates acknowledged that respondent had admitted sexually abusing Molly during her childhood but Yates did not pursue that admission in therapy because he was primarily focusing on the current family. Reverend Yates did not mention the sexual abuse of Molly in any of his reports concerning his treatment of respondent and Kathleen C. aside from noting that respondent's second marriage was "a disaster."

Reverend Yates testified that the family was caring and normal and had high potential for reunification. He acknowledged, however, that it was not normal for a family to have issues of domestic violence, incest, and a broken bone caused by a caretaker.

On cross-examination, Reverend Yates acknowledged that he was not a licensed clinical social worker and was not State certified.

Dvorsky testified that in addition to counseling through DCFS referrals, respondent and Kathleen C. began counseling with Reverend Leroy Yates of the Westside Holistic Family Center in July 1997. Respondent and Kathleen C. found Reverend Yates on their own and were not referred to him by DCFS. Dvorsky testified that Hephzibah, upon examining psychological evaluations tendered by Yates, determined that he was not qualified to provide respondent and Kathleen C. with the counseling services that they needed. Dvorsky testified that Yates had participated in several staffings at Hephzibah and had tendered reports on the case. Yates had noted in a September 1997 report submitted to Hephzibah that respondent and Kathleen C. were cooperative, were learning how to communicate and listen, and were finding new ways to solve problems and live together peacefully. The report concluded that if the family continued to cooperate with the counseling process, in time they may grow into an adjusted, functional

family. In a May 9, 1998, document prepared for Hephzibah by Yates, he indicated that respondent and Kathleen C. were making progress in counseling and concluded that continuing to postpone reunification of the family would be unwise.

Seghetti testified that she had spoken with Leroy Yates approximately a dozen times over the past two years. Seghetti believed that Yates minimized the allegations contained in the petitions for adjudication of wardship. She believed Yates had simply accepted what respondent told him happened and had failed to consider the best interests of the children. Seghetti testified that Yates was a pastor and that his reports in the case did not comport with the usual standards of therapy and scientific analysis and protocols. Based on things respondent and Yates had said in the past, Seghetti believed Yates had told respondent and Kathleen C. that DCFS was involved in conspiracies designed to take children away from their families. Yates also passed on to respondent and Kathleen C. some sensitive and confidential information revealed by the children's therapist in a June 1998 staffing.

After hearing the evidence, the court made extensive findings and held that respondent and Kathleen C. were both unable, unwilling, and unfit. The court adjudged the children wards of the court and ordered that the children be placed in the guardianship of DCFS.

Respondent now appeals the circuit court's adjudication of wardship, contending that the court's finding that he was unfit, unable, and unwilling was against the manifest weight of the evidence and that the court erred in allowing the testimony of Molly C.

In addition to briefs filed by the State and respondent, we note that the Cook County public guardian, as guardian *ad litem* for April, Amy, and Anna, has filed a brief urging that the trial court's order be affirmed.

Respondent first contends that the trial court's decision finding him unwilling, unable, and unfit to parent his daughters was against the manifest weight of the evidence. Specifically, respondent argues that the court's finding was not supported by the evidence because he had completed all of the tasks and conditions assigned to him by DCFS and had even sought out additional counseling help.

■ ■ The petitions in this case were asking that April, Amy, and Anna be adjudicated wards of the court. Pursuant to section 2—27 of the Juvenile Court Act of 1987, a minor may be adjudged a ward of the court and custody taken away from the parents where it is determined that the parents are either unfit or unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline a minor or are unwilling to do so. 705 ILCS 405/2—27(1)

(West 1998); *In re Lakita B.*, 297 Ill. App. 3d 985, 992, 697 N.E.2d 830 (1998). The standard of proof in a trial court's section 2—27 finding of unfitness that does not result in a complete termination of all parental rights is a preponderance of the evidence. *In re Lakita B.*, 297 Ill. App. 3d at 994. "On review, the trial court's determination will be reversed only if the findings of fact are against the manifest weight of the evidence or if the trial court committed an abuse of discretion by selecting an inappropriate dispositional order." *In re T.B.*, 215 Ill. App. 3d 1059, 1062, 574 N.E.2d 893 (1991). A finding is against the manifest weight of the evidence where a review of the record clearly demonstrates that the result opposite to that reached by the trial court was the proper result. *In re T.B.*, 215 Ill. App. 3d at 1062. Because a trial court is in a superior position to assess the credibility of witnesses and weigh the evidence, a reviewing court will not overturn the trial court's findings merely because the reviewing court may have reached a different decision. *In re Lakita B.*, 297 Ill. App. 3d at 994.

While arguing that the record shows he performed all services requested of him, respondent acknowledges that "the record is replete with caseworker opinions that [respondent] made no progress and was not a fit parent." The record is indeed replete with such opinions. Where the record contains more than ample evidence supporting the trial court's finding, respondent's argument that the finding was against the manifest weight of the evidence is unpersuasive.

The question before the trial court was not whether respondent had participated in recommended services. As set forth above, the court, through the dispositional hearing, was attempting to determine whether the children should be adjudged wards of the court on the basis that respondent and Kathleen C. were unfit or unable, for some reason other than financial circumstances alone, to care for, protect, train, or discipline the minors or were unwilling to do so, and that it was in the best interest of the minors to take them from the custody of their parents. 705 ILCS 405/2—27(1) (West 1998).

There is no question that respondent committed acts of abuse against children in his care. In fact, respondent entered into a stipulation acknowledging that he had been the perpetrator of acts of physical abuse and excessive corporal punishment and that the children were at a substantial risk of injury. The evidence showed that respondent committed various acts of physical abuse against the children in the home, including breaking a bone of one of the grandchildren during potty training, grabbing Anna by the neck, and whipping April, Amy, and Anna with a board, belt, or hand whenever they got into "trouble." We note that other instances of abuse not specifically referred to in testimony during the dispositional hearing are noted in

various reports entered into evidence. For example, one report notes that Amy reported to her school teacher that her father had twisted her ankle "because she had been bad that weekend."

Subsequent to the findings of abuse, respondent participated in various recommended services. However, respondent's participation in the various recommended services does not mean that a disposition other than that entered by the trial court would be in the best interests of the children. In fact, the record contains almost no support for the proposition that reunification with respondent would be in the children's best interests. Instead, three different caseworkers involved in the case testified that it was in the best interests of the children to be made wards of the court. They opined, *inter alia*, that respondent had not received all of the services necessary to make the home environment safe with him present, that respondent did not have his anger issues under control, and that Kathleen C. did not have the ability to protect the children from him. Nor, aside from reports made by Reverend Yates, do any of the reports, assessments, and other documentary exhibits entered in this case recommend that it was in the children's best interests to be in the custody of respondent. For example, the September 1997 bonding assessment recommended that the girls not be returned home due to the psychological issues affecting each parent. The assessment noted, among other things, that respondent became hostile at one point during the interview, which raised "immediate concerns of his impulsiveness and limited judgment with regards to anger management." A March 1999 transfer summary from Hephzibah completed just prior to the dispositional hearing stated that "[a]t this time, it does not seem as though reunification is possible. [Respondent and Kathleen C.] have made minimal progress in therapy and continue to blame others as to why the children are in care. Also, the children's behaviors escalate surrounding parental visitation and they have appeared fearful of their father and untrusting of their mother."

It should be noted that respondent's participation in the recommended services was often less than satisfactory. Further, contrary to respondent's contention, the record also reveals that not all of the recommended services were completed and in some cases were not even started.

Although respondent participated in a bonding assessment in September 1997, the assessment described him as "minimally cooperative" and "resistant, guarded, and defensive." In supervised visitations with April, Amy, and Anna, it was observed that the children seemed emotionally flat and afraid of respondent. Respondent engaged in inappropriate behavior during visitation, such as whispering to the

girls, which resulted in negative effects in the girls' behavior upon returning to the foster home. Visitation deteriorated to the point that three workers were required to be present at the supervised visitations to prevent respondent and Kathleen C. from whispering to the girls. Respondent had become volatile and threatening toward caseworkers during visitation, resulting, on one occasion, in a Hephzibah employee calling the police and visitation being suspended for four weeks.

Respondent wore sunglasses and slept through much of the first parenting class he and Kathleen C. attended. The first attempt at family therapy had been terminated due in part to respondent's attitude and inappropriate behavior. The second attempt at family therapy, in which respondent was not involved, ended in part due to inappropriate behavior on the part of Kathleen C., and in part because the therapist believed the girls were not comfortable bringing forth any issues to Kathleen C. out of fear she would tell respondent.

Although respondent maintains he was not referred for services that may have helped him, like domestic violence counseling or psychotropic medications, the record reveals otherwise. Upon being referred for domestic violence counseling in January 1999, respondent informed Seghetti that he needed to confer with his attorney regarding the referral. At the time of the dispositional hearing, respondent had failed to get back to Seghetti regarding the referral. Seghetti also testified that respondent had failed to follow through on a referral for a neuropsychological examination, and she did not know if he had followed through on a second referral for a neuropsychological examination made in December 1998. Seghetti also referred respondent for a psychiatric follow-up examination in early February of 1999. Seghetti testified that she had not received any indication that respondent had followed through with the referral.

There was also evidence that respondent had not yet gotten his anger issues under control. In addition to incidents mentioned above, including respondent's threatening and hostile behavior toward caseworkers during visitation, Lysa Seghetti testified that respondent approached her in court in an aggressive and threatening manner and a sheriff was called to intervene.

Finally, there was evidence that respondent's progress was impeded by his belief that all of the professionals involved in the case, with the exception of Reverend Yates, were part of a conspiracy to prevent the children from returning home.

In sum, the circuit court's finding that respondent was unable, unwilling, and unfit to care for April, Amy, and Anna was not against the manifest weight of the evidence. The fact that respondent

participated in various recommended services does not persuade us that the trial court's decision was against the manifest weight of the evidence where there was ample evidence that respondent continues to be a threat to the children's safety and has not made sufficient progress in a number of areas.

Respondent next maintains that the trial court erred in allowing the testimony of Molly C. regarding alleged sexual abuse by respondent when she was a minor. According to respondent, where the alleged sexual abuse of Molly took place over 20 years ago, it could not aid the court in determining whether respondent could parent the children in the instant case.

Respondent cites no case law in support of his contention that the testimony of Molly C. should not have been allowed, and instead attempts to factually distinguish *In re J.H.*, 212 Ill. App. 3d 22, 570 N.E.2d 689 (1991), the case cited by the circuit court in ruling that it was going to allow Molly's testimony. In *In re J.H.*, the respondent father contended that the trial court erred in admitting into evidence portions of a social investigation report relating to sexual abuse where the petition for adjudication was based on dependency. On appeal, the court found the information concerning respondent's alleged sexual abuse was relevant and admissible because it impacted such issues as possible reunification of the respondent and his children. *In re J.H.*, 212 Ill. App. 3d at 27-28. In the instant case, respondent argues that *In re J.H.* is inapplicable because the sexual abuse in that case concerned a named minor and the abuse was more contemporary. Here, Molly was not a named minor and the alleged abuse occurred over 20 years ago.

■ Under the Juvenile Court Act of 1987, "proof of the abuse, neglect or dependency of one minor shall be admissible evidence on the issue of the abuse, neglect or dependency of any other minor for whom the respondent is responsible." 705 ILCS 405/2—18(3) (West 1998). We find respondent's attempt to distinguish *In re J.H.* to be unpersuasive because relevant and admissible evidence under the above section is not limited to minors who are part of the same family unit or to contemporary instances of abuse. See *In re Harpman*, 146 Ill. App. 3d 504, 513-14, 496 N.E.2d 1242 (1986) (where evidence of respondent father's sexual abuse of daughters by a prior marriage established two years earlier was found admissible in a dispositional hearing regarding wardship of children in current marriage despite fact that there was no direct evidence of sexual abuse of children in current marriage); see also *In re Edricka C.*, 276 Ill. App. 3d 18, 30, 657 N.E.2d 78 (1995) (holding that past sibling abuse was admissible, although it was, by itself, insufficient to show that abuse and neglect were imminent for child at issue).

■ Moreover, section 2—22(1) of the Juvenile Court Act of 1987 states, in pertinent part:

> "At the dispositional hearing, the court shall determine whether it is in the best interests of the minor and the public that he be made a ward of the court, and, if he is to be made a ward of the court, the court shall determine the proper disposition best serving the \*\*\* interests of the minor and the public. \*\*\* All evidence helpful in determining these questions, including oral and written reports, may be admitted and may be relied upon to the extent of its probative value, even though not competent for the purposes of the adjudicatory hearing." 705 ILCS 405/2—22(1) (West 1998).

It was the legislature's intent, through the above section, to give the trial court wide latitude in considering evidence that is relevant and helpful to the court's determination of a proper disposition. See *In re J.H.*, 212 Ill. App. 3d at 27; *In re White*, 103 Ill. App. 3d 105, 111, 429 N.E.2d 1383 (1982).

■ Although an examination at Under the Rainbow when the children were first taken into custody revealed no evidence of sexual abuse, we cannot say, upon the record before us, and given the wide latitude given a trial court to consider evidence in dispositional hearings, that the trial court erred in allowing the testimony of Molly C. Molly's testimony was relevant and helpful to the trial court in that it raised concerns that the children in the instant case may have been the victims of sexual abuse or were at risk of becoming victims of sexual abuse if not protected from respondent. By the time the testimony of Molly became an issue at the dispositional hearing, there had been evidence presented that Anna had acted out sexually in the foster home by asking who was going to pat her vagina, masturbating, and attempting to involve another younger child in masturbation. That fact was acknowledged by the trial court where, in ruling that it was going to allow Molly's testimony, it noted that evidence had already been entered that Anna had acted out sexually in the foster home. The record also contains evidence that the children's therapist suspected that the children had been sexually abused. Finally, subsequent to Molly C.'s testimony, Reverend Yates testified that respondent had admitted to him that he had sexually abused Molly when she was a minor. Molly's testimony was admissible and relevant to a determination regarding whether April, Amy, and Anna should be made wards of the court, and the trial court did not err in allowing the testimony.

Assuming, *arguendo*, we were to find that the testimony had been improperly admitted, respondent has failed to show that he was prejudiced by that admission. "As a general rule, error in the exclu-

sion or admission of evidence is harmless and does not require reversal if there has been no prejudice or if the evidence has not materially affected the outcome of the trial." *Phillips v. Britton*, 162 Ill. App. 3d 774, 786, 516 N.E.2d 692 (1987). Aside from a general assertion that the trial court "attached much significance" to Molly's testimony, respondent makes no argument that he was prejudiced by the admission of her testimony. We disagree with respondent's characterization of the court's ruling. The court's findings of fact and ruling in this case are set forth in 20 pages of transcript in the record. Aside from briefly describing Molly's testimony and making a finding that she was credible, the trial court in no way emphasized her testimony in its ruling and made no findings of sexual abuse whatsoever. Considering the ample evidence (discussed previously) supporting the trial court's finding that respondent was unfit, unable, and unwilling to parent the children, we cannot say that the admission of Molly C.'s testimony affected the outcome of the hearing.

Accordingly, the findings and orders of the circuit court are affirmed.

Affirmed.

CAHILL and GORDON, JJ., concur.