# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black">

### *In re Joseph J.*, 2020 IL App (1st) 190305

</div>

| | |
|---|---|
| Appellate Court Caption | *In re* JOSEPH J. and A.A., Minors (The People of the State of Illinois, Petitioner-Appellee, v. Miriam M., Respondent-Appellant). |
| District & No. | First District, Sixth Division<br>No. 1-19-0305 |
| Filed | January 17, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 17-JA-0955, 17-JA-0956; the Hon. Peter J. Vilkelis, Judge, presiding. |
| Judgment | Affirmed in part; dismissed in part. |
| Counsel on Appeal | E. Madeline O'Neill, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Gina DiVito, and Brian A. Levitsky, Assistant State's Attorneys, of counsel), for the People.<br><br>Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain, of counsel), guardian *ad litem*. |

Panel                    JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Justices Connors and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1    The State filed separate petitions for wardship over minor children Joseph J. and A.A., who are unrelated but lived in the same home. On the State's motion and over Joseph's parents' objection, the cases were consolidated. In its petition, the State alleged that Joseph was neglected and abused due to substantial risk of injury. The petition was based upon Joseph's mother's failure to protect him from an environment where A.A. was physically abused and another minor child, Steven F., was killed.

¶ 2    At an adjudicatory hearing, the circuit court of Cook County found that the children were physically abused and neglected. The court then held a dispositional hearing, at which time it found respondent Miriam M., Joseph's mother, unable and unfit to care for Joseph and placed him under the guardianship of the Department of Children and Family Services (DCFS). In a separate permanency order entered the same day, the court set a goal of substitute care pending a court determination on termination of parental rights. Miriam now appeals. For the following reasons, we affirm the judgment of the circuit court of Cook County in part and dismiss in part.[1]

¶ 3                                    BACKGROUND

¶ 4    Miriam is the mother of Joseph, a male minor born in 2014. When Joseph was almost three years old, he lived in an apartment with his father, James, and his father's girlfriend, Joy. Joy's children also lived in the apartment, including three-year-old Steven and 22-month-old A.A. None of Joy's children were related to Joseph or James. Although she did not live there, Miriam also regularly slept over at the apartment occupied by Joy, James, and the children at issue.

¶ 5    On September 13, 2017, three-year-old Steven was taken to the hospital and pronounced dead. The medical examiner determined that Steven, who was covered with marks and bruises, died of blunt force trauma to the abdomen and that his cause of death was homicide. A.A. was also examined at the hospital, and the hospital staff discovered bruises on her face and all over her body that were the result of physical abuse.

¶ 6    Following Steven's death, Miriam, James, and Joseph moved around for a few days and evaded the police. Meanwhile, Joy was charged with first degree murder for the death of Steven.[2]

¶ 7    The State filed two separate petitions for wardship of Joseph and A.A. The petition regarding Joseph alleged that he was neglected and at a substantial risk of physical injury due

---

[1]Joseph's father, James J., also appealed the circuit court's ruling. This court disposed of that appeal in a summary order pursuant to *Anders v. California*, 386 U.S. 738 (1967), dated August 2, 2019. (James and Miriam's appeals were initially consolidated in this court but have since been severed.)

[2]At the time of this appeal, Joy is the only person who has been criminally charged with Steven's death.

to an environment that was "injurious to his welfare." The petition noted that Joseph had been residing in the same home as Steven, who had just "died of blunt force trauma," and as A.A., who "was found to have multiple bruising on various places all over her body *** which were the result of physical abuse." The petition additionally noted that Miriam had one prior "indicated report" for controlled substance in a newborn.

¶ 8        The State filed a motion to consolidate the two wardship petitions regarding Joseph and A.A. The State argued that even though the two children are not related, their cases arose from the same set of facts where they both lived in the same environment. Miriam objected to the State's motion to consolidate the petitions. She argued that the State was trying to confuse the responsibilities of herself and James with the responsibilities of A.A.'s parents.

¶ 9        The trial court granted the State's motion to consolidate. The court stated:

> "First of all, these cases are not about the parents. These cases are about the children. *** [C]ounsel concedes that the minor Joseph lived in the same environment as [A.A.] and the deceased child. The facts that would come out during the trial of these two cases are strikingly similar. It would be the same witnesses testifying about the same environment, the environment that this Court is being asked to analyze to determine whether it's an injurious environment. For these two children, it's essentially the same environment. And I am not going to confuse the relative responsibilities of the parents as to these two children. But for purposes of judicial economy, I think the motion to consolidate is well-founded."

¶ 10        An adjudication hearing commenced on the wardship petitions for Joseph and A.A.[3] DCFS child protection investigator Elisa Corona testified that she was assigned to investigate the death of Steven, as well as to investigate allegations that A.A. had been abused and Joseph was at risk of harm. As part of her investigation, she met with Miriam and Joseph at the police station on September 18, 2017. She characterized Miriam's interactions with Joseph as "positive" and did not see any cuts, welts, or bruises on Joseph. Miriam told Investigator Corona that she did not live at James and Joy's apartment but that she was there "all the time" and she slept there several nights during the week. Miriam did not allow Joy to watch Joseph because "she didn't like the way Joy talked to her children," she saw Joy hit her children, and it was "normal" to hear screams coming from the bedroom Joy shared with her children. When asked about disciplining Joseph, Miriam said that she and James would yell at him, slap his hand, and use a belt on his buttocks.

¶ 11        Miriam told Investigator Corona that in the month leading up to his death, Steven looked pale and vomited a lot. The evening before Steven died, Miriam was not at the apartment, but she did video chat with James and Joseph. During the video chat, she could hear screams in the background but that was "not unusual." She also saw bruises on A.A.'s face during the video chat.

¶ 12        Miriam admitted that she evaded the police after Steven died. She was afraid that DCFS would take Joseph. Following her conversation with Miriam, Investigator Corona decided to take protective custody of Joseph.

¶ 13        Elk Grove Village police detective Veronica Rohman testified next. On September 14, 2017, Detective Rohman interviewed Joy. A video recording of the interview was admitted

_____

[3]The petition regarding A.A. is not at issue in this appeal.

into evidence. During the interview, Joy admitted to hitting A.A. but only on her buttocks and hands. She suggested that the marks and bruises on A.A.'s face were all from accidents. She also told Detective Rohman that James could be excessive when disciplining the children. For example, James would discipline Steven when he had potty-training issues by making him do exercises or striking him on the buttocks.

¶ 14 In her videotaped interview, Joy stated that about two weeks before his death, Steven began vomiting a lot. She took him to see a doctor, but the doctor did not provide any treatment. She could not explain why the doctor's office did not have any documentation for the visit. Steven was "back to normal" until the day before he died; he then began complaining that his stomach hurt and had difficulty eating solid foods. The morning that he died, Steven woke up crying and covered in his own feces. Joy tried to wash Steven off in the shower, but he fainted. James then came home, saw that Steven was unconscious, and drove them to the hospital. James disappeared after dropping Joy and Steven off at the hospital. Steven later died.

¶ 15 After taking a break during her videotaped interview, Joy admitted that she lied about taking Steven to the doctor because she did not want to get into trouble. She also changed her story regarding the morning Steven died. She said that she came home from work and discovered James running water over Steven in the shower because he had just defecated on himself. Steven was unconscious. She did not ask James what happened, but she took Steven to the hospital. She said that she knew it was James who fatally hit Steven in the stomach and that she would not protect him anymore. James told her, "[D]on't tell [the police] I was ever alone with the kids in the morning."

¶ 16 Elk Grove Village police detective Michael McIntyre also testified. He interviewed James twice, on September 17 and 18, 2017. Video recordings of both interviews were admitted into evidence. In his videotaped interview, James denied ever hurting Steven or A.A., but he admitted to knowing that Joy repeatedly hit her children with a belt. He stated that Joy had recently "whooped" Steven and A.A. He explained that his method of disciplining Joseph was a "scare tactic." He would sometimes hit Joseph with his hand but never with a belt.

¶ 17 James stated that in the days before Steven died, he was vomiting a lot. Steven deteriorated over time, moving "slower" and laying down often. On the morning that Steven died, James was heading out the door to work when he heard Joy make an outcry. He went back into the apartment and found Joy holding Steven, who was unconscious, and running water over him in the shower. Steven was completely naked, and James did not see any marks on his body. He did notice that Steven had defecated all over himself, though. James then drove Steven and Joy to the hospital. He dropped them off and then returned to the apartment for the other children. He later learned that Steven had died. He blamed Joy for Steven's death and called her a "monster."

¶ 18 Following Steven's death, James avoided talking to the police because he had an outstanding warrant. He, Miriam, and Joseph moved around for a few days to evade the police and DCFS. James admitted to instructing Joy to tell the police he had not been alone with the children in the past three months because he did not want the police to think he had done anything wrong.

¶ 19 After the State rested, Joseph, A.A., and Miriam all rested without introducing additional evidence.

¶ 20 At the conclusion of the adjudication hearing, the trial court made a finding of abuse and neglect for Joseph. The trial court stated: "As to [Miriam], she spent time in [the apartment].

She said that hearing screaming was not unusual. She accompanied [James] in his flight. She too had knowledge of the environment her son was in."

¶ 21     Following a subsequent disposition hearing, the court again stressed that Miriam knew about the ongoing abuse and neglect in the apartment where Joseph resided. The court found Miriam to be unable and unfit to parent Joseph and placed him in DCFS guardianship. The court also set Joseph's permanency goal as substitute care pending court determination on termination of parental rights. Miriam then appealed.

¶ 22                                                    ANALYSIS

¶ 23     Miriam challenges three orders on appeal: (1) the order consolidating Joseph and A.A.'s wardship petitions, (2) the disposition order finding Miriam to be unable and unfit to parent Joseph, and (3) the permanency order setting a goal of substitute care.[4] We find that we have jurisdiction to review the disposition order pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), as Miriam filed a timely notice of appeal following that order. We likewise have jurisdiction to consider the order of consolidation, given that it was a necessary step in the procedural progression leading to the disposition order. See *Burtell v. First Charter Service Corp.*, 76 Ill. 2d 427, 434-35 (1979).

¶ 24     However, the permanency order is interlocutory and non-final. See *In re Curtis B.*, 203 Ill. 2d 53, 59-60 (2002). This is because, by statute, a permanency order must be reviewed and reevaluated at least every six months until the permanency goal is attained. *Id.* (citing 705 ILCS 405/2-28(2) (West 1998)). (Indeed, the order at issue in this case explicitly set a date for the next permanency hearing: July 16, 2019.) In order to obtain review over a permanency order, a respondent must file a petition in this court within 14 days of the entry of the order. Ill. S. Ct. R. 306(a)(5), (b)(1) (eff. Nov. 1, 2017). Here, Miriam failed to file the necessary petition and did not even file her notice of appeal until well after the 14-day time period had elapsed. Accordingly, we lack jurisdiction to review that order.

¶ 25     *In re Faith B.*, 216 Ill. 2d 1, 17 (2005), cited by Miriam, does not compel a different result. In that case, our supreme court found that the trial court's permanency goal was final and appealable where (1) it was entered within a *dispositional* order, (2) the court did not set another permanency hearing, and (3) the permanency goal the court set was the status quo at the time. None of these circumstances are present here. The permanency goal of substitute care pending termination of parental rights was addressed in a separate permanency order, the court set a date for a future permanency hearing, and most importantly, the goal of substitute care pending termination of parental rights had not been achieved at the time it was set. Therefore, Miriam's parental rights had not been terminated. As such, the order was subject to modification and was, necessarily, not final. Accordingly, we lack jurisdiction to review that order in this appeal.

¶ 26     Turning then to Miriam's challenge to the court's order consolidating the wardship petitions for Joseph and A.A., the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2016)) does not mention consolidation; therefore, we look to the Code of Civil Procedure (Code) (735 ILCS 5/1-101 *et seq.* (West 2016)). *In re A.B.*, 308 Ill. App. 3d 227, 234 (1999) (proceedings under the Act follow the Code unless the Act specifically governs the

_____

[4]Miriam makes no argument challenging the adjudication order finding Joseph to be abused and neglected.

procedure at issue). The Code allows for consolidation of actions pending in the same court as an aid to convenience, where it can be done "without prejudice to a substantial right." 735 ILCS 5/2-1006 (West 2016). Consolidation is appropriate where two cases "(1) are of the same nature; (2) arise from the same act or event; (3) involve the same or like issues; and (4) depend largely on the same evidence." *Edwards v. Addison Fire Protection District Firefighters' Pension Fund*, 2013 IL App (2d) 121262, ¶ 42. We review a court's ruling on a motion to consolidate for an abuse of discretion. *Turner v. Williams*, 326 Ill. App. 3d 541, 546 (2001). A court abuses its discretion where its decision is "arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. Rivera*, 2013 IL 112467, ¶ 37.

¶ 27    In this case, all factors favor consolidation. Both Joseph's and A.A.'s cases were petitions for wardship. The children resided in the same home. A.A.'s case arises from the direct abuse and neglect she suffered, while Joseph's case arises from Miriam's failure to protect him from the same environment where A.A. was abused (and Steven was killed). The issues—whether to remove A.A. and Joseph from their biological parents—were identical. The two cases, as the trial court noted, depended upon the same witness testimony; specifically, Investigator Corona, who investigated both Joseph and A.A.'s cases, and the two detectives who interviewed Joy and James.

¶ 28    To be sure, Joseph and A.A. do not have parents in common. But this carries little weight where the children *lived in the same home*, interacted *with the same three adults*, and the injuries to the children occurred within that environment. To the extent Miriam argues that prejudicial evidence of abuse of the children who were not her responsibility was considered against her, the court explicitly stated that it would not confuse the responsibilities of the different parents. Miriam does not point to anything in the record that suggests the contrary, while the factors supporting consolidation were reasonable, practical, and supported judicial economy. Accordingly, we conclude that the court did not abuse its discretion in consolidating these cases.

¶ 29    Finally, we address Miriam's challenge to the court's order finding her to be unfit and removing Joseph from her custody. Section 2-27 of the Act permits a court to commit an abused and neglected minor to the custody of DCFS if the court determines that the parents are "unfit or unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so." 705 ILCS 405/2-27(1)(d) (West 2016). Significantly, this language is disjunctive: a minor may be removed from a parent if that parent is "*either* unfit *or* unable *or* unwilling." (Emphases in original.) *In re Lakita B.*, 297 Ill. App. 3d 985, 992 (1998).

¶ 30    Here, Miriam concedes the correctness of the court's finding that she is unable to care for Joseph. Specifically, Miriam acknowledges that she is still in therapy and parenting classes and that "additional time is needed to show the court that she has made substantial progress on the issues that brought the case in." Because she concedes that she is *unable* to care for Joseph, the issue of whether the court properly found her *unfit* is moot; the finding of inability is an independent and sufficient basis to support the court's judgment. See *id.* at 992-93 (holding that where mother on appeal did not challenge court's determination that she was unable to care for her child, her challenge to the court's finding that she was also unfit was moot). Thus, we need not address Miriam's challenge to the court's disposition order finding her unfit and

placing Joseph in DCFS guardianship.[5]

¶ 31                                        CONCLUSION

¶ 32    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County granting consolidation as well as its disposition order. We dismiss Miriam's appeal from the court's permanency order for lack of jurisdiction.

¶ 33    Affirmed in part; dismissed in part.

---

[5]Even if the issue of Miriam's fitness was not moot, the manifest weight of the evidence more than supports the court's finding that Miriam was unfit. See *In re April C.*, 326 Ill. App. 3d 245, 257 (2001) (noting that review of a trial court's findings of fact under section 2-27 is subject to manifest weight of the evidence standard (citing *In re T.B.*, 215 Ill. App. 3d 1059, 1062 (1991))). Miriam did nothing to protect Joseph from the environment in which A.A. was physically abused and Steven was killed, despite witnessing and acknowledging the dangerous conditions that existed for the children in that home.