NOTICE

Decision filed 10/20/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250465-U

NO. 5-25-0465

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* HEZEKIELL J., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 25-JA-10 |
| | ) | |
| Shameria J., | ) | Honorable |
| | ) | Robert E. Jacobson, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE SHOLAR delivered the judgment of the court.
Justices Cates and Hackett concurred in the judgment.

**ORDER**

¶ 1     *Held*:   We affirm the circuit court's orders finding the minor neglected and making him a ward of the court, where the evidence supported the court's findings.

¶ 2     Respondent, Shameria J., appeals the circuit court's orders finding her son, Hezekiell J., neglected, and awarding his custody and guardianship to the Department of Children and Family Services (DCFS). Her appointed appellate counsel concludes that there is no reasonably meritorious argument that the court erred in either respect. Accordingly, he filed a motion to withdraw, along with a supporting memorandum. See *Anders v. California*, 386 U.S. 738 (1967). Counsel notified respondent of his motion, and this court provided her ample opportunity to respond. However, she has not done so. After considering the record on appeal, counsel's motion,

1

and the supporting memorandum, we agree that this appeal presents no arguably meritorious issues. We therefore grant counsel leave to withdraw and affirm the circuit court's orders.

¶ 3                                  I. BACKGROUND

¶ 4      On January 31, 2025, the Department of Children and Family Services (DCFS) took protective custody of Hezekiell J. following his birth on January 24, 2025. On February 3, the State filed a petition for adjudication of wardship, alleging Hezekiell neglected, pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b) (West 2022)) by reason of being in an environment injurious to his welfare because his mother, respondent Shameria J., failed to correct the conditions that resulted in an adjudication of her unfitness to parent the minor's half-sibling, Hezekih J.[1], and because, while residing with his mother, Hezekiell's environment exposed him to the effects of her mental illness.

¶ 5      At a February 3, 2025, temporary custody hearing, the court found probable cause to believe that Hezekiell was neglected. The court observed that respondent had been found unfit and unable to parent another child, Hezekih. She had longstanding mental health issues but was resistant to getting treatment. The court found that respondent needed to engage in services to address how her mental health issues "impact her ability to safely parent her child." The court noted that respondent completed some services in Hezekih's case and generally had positive visits. However, she had

> "not begun parenting coaching, has only recently started counseling (two sessions thus far), has not yet completed a psychological evaluation (although it has been scheduled), and has not yet completed a psychiatric evaluation (yet to be scheduled). The

---

[1]On October 17, 2024, the circuit court of Champaign County entered a dispositional order in case No. 24-JA-59, finding Hezekih J., who was born in June 2018, neglected and that Shameria J. was unfit and unable to parent him. The dispositional order was affirmed by this court in 5-24-1218 on April 2, 2025.

services that have only just begun or have yet to take place are necessary for [her] to demonstrate *** she had addressed her mental health issues such that she can safely parent a child."

¶ 6    The court convened an adjudicatory hearing on May 1, 2025. Tracy Conroy, a clinical behavioral therapist for the Center for Youth and Family Solutions (CYFS), testified that DCFS referred respondent to her. Conroy and respondent held a video session on January 14, 2025. The purpose of the meeting was to conduct an assessment to establish a diagnosis and treatment plan. This typically takes six to seven one-hour sessions to complete, provided the client participates appropriately.

¶ 7    Following the assessment, however, respondent did not have any treatment goals or objectives "due to lack of information." Conroy explained that respondent was initially cooperative but then stopped cooperating. She accused Conroy of having a "hidden agenda," and said that she did not trust her. Conroy's "diagnosis" was "unspecified trauma due to lack of information" from respondent. The only traumas respondent specifically identified were previous "domestic violence" and some anxiety over her children being "stolen" by DCFS. She denied having depression or anger issues. Respondent participated in six or seven weekly visits between January 14, 2025, and the end of February 2025. She was discharged from therapy due to a lack of engagement. Conroy's discharge summary, which the court admitted into evidence, recommended that respondent seek mental health treatment "when she was ready to process her emotional regulation and trauma."

¶ 8    Conroy attempted numerous times to get respondent to re-engage in therapy. However, respondent answered with accusations, such as Conroy having a "hidden agenda." During sessions

that respondent did attend, she expressed discontent at being "disrespected" by DCFS, CYFS, and Addus HomeCare, the visitation supervisor.

¶ 9    Sam Mosley, a DCFS investigator, testified at the adjudicatory hearing. He was assigned on January 24, 2025, to investigate allegations of abuse and neglect against Hezekiell J. He spoke with respondent at Carle Hospital. Initially, she would not discuss the case with him, so he went to the neonatal intensive care unit to see Hezekiell. When he returned, respondent told him that she had an open DCFS case involving Hezekih. She said that her caseworker was Denise Perry. She said that parenting classes in that case were on hold "due to the caseworker," and a psychiatric evaluation on November 11, 2024, had been "normal."

¶ 10    Perry also testified at the adjudicatory hearing. She testified that she was the caseworker in Hezekih's case. Respondent's services in that case included parenting classes, parenting coaching, therapy, a psychiatric assessment, a psychological evaluation, and toxicology screens.

¶ 11    As of February 2025 respondent cooperated with services. She began therapy with Conroy, finished parenting classes and toxicology screens, and had a psychological evaluation scheduled. However, Conroy did not feel that respondent was cooperating with the agency. Respondent "put up an argument *** towards everything." She "eventually did it, but it was always an argument first."

¶ 12    Respondent underwent a psychological evaluation on February 26, but Perry had yet to receive a report. Respondent also needed a psychiatric evaluation; however, the initial referral for a psychiatric assessment expired and had to be renewed. However, the appointment had not yet been made. As of February 2025 Perry was not close to returning Hezekih J. to respondent because she had not completed services.

¶ 13   Perry last observed a visit between respondent and Hezekih in June 2024 and a visit between respondent and Hezekiell in February 2025. Visits generally were "pretty good." At a February visit with Hezekiell, however, respondent "made small comments about foster parents." She made "unconstructive" comments about the foster parents at other visits as well. When Perry spoke to her about this, she "kind of just brush[ed] it off."

¶ 14   Respondent testified on her own behalf. She testified that, in Hezekih's case, she completed parenting classes, underwent a psychological evaluation, and started individual counseling with Conroy. She had not yet begun parenting coaching because DCFS had put it "on hold." She regularly exercised visitation with Hezekih until, in March, she asked for a new visitation supervisor. Until then, all of her visits with him went well. Respondent explained that visitation was suspended after she had a confrontation on March 26 with the Addus visitation supervisor about the type of formula she was providing for Hezekiell.

¶ 15   On cross-examination, respondent testified that, after the March 26 confrontation, she told the visitation supervisor that she was no longer allowed to transport Hezekiell to visitations. When the same worker returned the following week, respondent called the police.

¶ 16   At the conclusion of the testimony, the court found that Hezekiell J. was neglected as alleged in both counts of the petition. With respect to count I, the court noted that respondent had a number of services to complete to correct the conditions that caused her to lose custody of Hezekih but completed only two. Moreover, the result of one of those—the psychological evaluation—was not yet known. With respect to count II, the court found that respondent had "long-standing mental health issues and a resistance to consistent treatment for those issues."

¶ 17      The court observed that respondent had been uncooperative with DCFS, believing that she could "pick and choose what she wants to do in this case, how she wants to do it, [and] on what terms she's willing to interact with people." The court continued:

> "And she's had difficulty with the caseworker, Ms. Perry. She's had difficulty with an Addus worker. She's had difficulties with the foster parent. She's had difficulties with the counselor, Ms. Conroy, and in [respondent's] estimation all of the difficulties with all of those various people are it's—it's their problem, and—and obviously there's a common denominator with all the difficulties and all of those various people that [respondent] has had trouble with and she's that common denominator."

¶ 18      The court noted that respondent was unsuccessfully discharged from therapy, and her visitation was "put on hold" in both cases because she disagreed with how visits were being conducted. The court concluded that the conditions that led to the prior adjudication of parental unfitness had not been corrected. The court further found that, notwithstanding the absence of a diagnosis of mental illness, the evidence supported a conclusion that respondent had a mental illness that made her unable to regulate her emotions and that she exposed Hezekiell to the effects thereof. A written adjudicatory order was entered on May 1, 2025, finding Hezekiell to be a neglected minor.

¶ 19      In anticipation of a May 29, 2025, hearing, DCFS filed a dispositional report. Respondent reported experiencing temporary homelessness as of May 8, 2025, and requested assistance finding housing on May 23, 2025. Her mental health history included diagnoses of depression and attention deficit/hyperactivity disorder, and suicidal and homicidal statements in 2019. The report contained a psychological evaluation , according to which she was diagnosed with post-traumatic

stress disorder, adjustment disorder with mixed disturbance of emotions and conduct, borderline personality disorder, and narcissistic personality disorder.

¶ 20 The dispositional report noted that Hezekiell was with foster parents in Danville. Despite several health problems at birth, he recovered with care and treatment. The report noted that Hezekiell was doing well. DCFS recommended that it be awarded custody and guardianship of Hezekiell.

¶ 21 At the dispositional hearing, the court admitted the Champaign County Sheriff's incident report regarding the conflict between respondent and the Addus visitation supervisor, Laura Hoelscher. The report noted that Hoelscher arrived to transport respondent to a visit with Hezekiell. Respondent felt that Hoelscher disrespected her and asked her to leave. Per policy, Hoelscher was required to wait 15 minutes or call her supervisor. Respondent called the police. When the supervisor could not be reached, Hoelscher waited the required 15 minutes and left. For purposes of the dispositional hearing, the court also admitted a letter written by respondent in March 2025 with her complaints about DCFS.

¶ 22 The court heard arguments and recommendations from the State and respondent's counsel. Additionally, the guardian *ad litem* recommended that respondent be found unfit and the minor be made a ward of the court. The court found it in Hezekiell's best interests to be made a ward of the court and adjudged neglected. It also found respondent unfit and unable to care for him.

¶ 23 The court noted respondent's "significant and longstanding mental health issues—and a resistance to consistent treatment for said issues—that currently prevent her from safely caring for the minor." In announcing its ruling, the court explained that the psychological evaluation led to the conclusion that respondent's perception of reality was very different from most people's, which the court attributed to her failure to correct the conditions that led to her adjudication of unfitness

7

in Hezekih's case. In that case, she had left Hezekih unattended for a long time, later giving varying explanations for her absence. In this case, in respondent's dealings with her service providers, "everything is the other person's fault." She also lacked "honest engagement in the assessment procedure and denial of existing problems," which prevented her from "accessing resources and support that may help her make additional progress individually as a parent. *** She presents with symptoms and then ultimately diagnoses of borderline personality disorder, PTSD, and narcissistic personality disorder." Respondent timely appealed.

¶ 24                                    II. ANALYSIS

¶ 25    Respondent's appointed appellate counsel concludes that there is no reasonably meritorious argument that the circuit court erred in finding that Hezekiell J. neglected, finding that respondent was unfit and unable to care for him, and in making him its ward. We agree.

¶ 26    Courts employ a two-step process to decide whether a child should be removed from his parents' custody and made a ward of the court due to abuse or neglect. *In re A.P.*, 2012 IL 113875, ¶ 18. Step one is the adjudicatory hearing on the petition for adjudication of wardship. *Id.* ¶ 19. At this proceeding, the State must prove the allegations of neglect by a preponderance of the evidence. *In re Arthur H.*, 212 Ill. 2d 441, 463-64 (2004). In other words, the State must establish that the allegations of neglect are more probably true than not. *Id.* at 464. On review, a circuit court's finding of neglect will not be reversed unless it is against the manifest weight of the evidence. *Id.*

¶ 27    Here, the evidence shows that respondent completed only two of the services required in the case involving Hezikih: a parenting class and a psychological evaluation. However, the results of the latter had not been received. She had not undergone a psychiatric assessment, which the court observed was critical to identifying the specific nature of her mental health issues. Respondent remained uncooperative with DCFS and with her service providers, was

8

unsuccessfully discharged from therapy, and, because of her attitude toward the visitation supervisor, had her visitation rights suspended. Thus, the evidence supported the court's finding that she failed to correct the conditions that led to Hezekih's removal from her care.

¶ 28    The court also found Hezekiell neglected in that residing with respondent exposed him to the effects of her mental illness. We need not consider this additional ground, however. The State need prove only one ground for neglect, and thus "when the circuit court has found a minor neglected on several grounds, we may affirm if any of the circuit court's bases of neglect may be upheld." *In re Faith B.*, 216 Ill. 2d 1, 14 (2005).

¶ 29    Counsel further contends that there is no reasonably meritorious issue that the court erred in making Hezekiell its ward. Pursuant to section 2-27 of the Juvenile Court Act of 1987, a minor may be adjudged a ward of the court and custody taken away from the parents if the court finds that the parents are either unfit or unable, for some reason other than financial circumstances alone, to care for, protect, train, or discipline a minor or are unwilling to do so. *In re April C.*, 326 Ill. App. 3d 245, 256-57 (2001) (citing 705 ILCS 405/2-27(1) (West 1998)). The standard of proof for a finding of parental unfitness that does not result in a complete termination of all parental rights is a preponderance of the evidence. *Id.* at 257. On review, the court's decision will be reversed only if its factual findings are against the manifest weight of the evidence or if the court committed an abuse of discretion by selecting an inappropriate dispositional order. *Id.*

¶ 30    Here, the court reasonably found that respondent's mental health issues, and her inability to take responsibility or meaningfully seek treatment for them, meant that Hezekiell's best interests required that he be removed from her care. The court noted that, despite respondent having been diagnosed with several conditions, she resisted receiving treatment, instead blaming others for

9

creating the problems. Based on the record before us, we agree that there is no reasonably meritorious argument that the court erred.

¶ 31                                    III. CONCLUSION

¶ 32    For the foregoing reasons, we grant appellate counsel leave to withdraw and affirm the orders of the circuit court of Champaign County.


¶ 33    Motion granted; orders affirmed.