**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 190011-U

Order filed October 21, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| *In re* So.H., Sy.H., and W.H., | ) | Appeal from the Circuit Court |
| | ) | of the 10th Judicial Circuit, |
| Minors | ) | Tazewell County, Illinois. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | Appeal Nos. 3-19-0011, 3-19-0012, |
| Petitioner-Appellee, | ) | and 3-19-0013 |
| | ) | Circuit Nos. 17-JA-10, 17-JA-11, and |
| v. | ) | 17-JA-12 |
| | ) | |
| Lisa H., | ) | |
| | ) | Honorable |
| Respondent-Appellant). | ) | Bruce Fehrenbacher, |
| | ) | Judge, presiding. |

_____

JUSTICE CARTER delivered the judgment of the court.
Presiding Justice Lytton and Justice Schmidt concurred in the judgment.

_____

**ORDER**

¶ 1       *Held*:  The trial court's finding that respondent was unable to care for the minors was not against the manifest weight of the evidence.

¶ 2       This appeal arises from the trial court's permanency review order, in which the trial court

found respondent, Lisa H., was unable to care for her minor children, So.H., Sy.H., and W.H.,

continued custody and guardianship of the minors with their fit father, and terminated wardship

of the minors. On appeal, respondent argues the trial court's finding that she was unable to care for the minors was against the manifest weight of the evidence. We affirm.

¶ 3                                        I. BACKGROUND

¶ 4        On November 4, 2016, the State filed a juvenile petition for wardship of the minors, alleging that the minors were neglected in that their environment was injurious to their welfare. The State alleged that the minors' mother (respondent) and the minors' father were unable to adequately care for the minors and, in part,[1] that: (1) on August 12, 2016, W.H. (13 years old at that time) and his older autistic sister, B.H. (17 years old at that time), ran away from respondent, police were called, respondent told police that the Department of Children and Family Services (DCFS) had instructed her to take the minors to jail, respondent was unwilling to interact with the minors, respondent repeated that she was taking W.H. and B.H. to jail, and after respondent refused to take B.H. home, a relative allowed B.H. to reside with him; (2) on January 27, 2016, the minors' father took W.H. and B.H. to a women's shelter and spoke with a counselor to determine whether the minors' mother was there, during which time he left the minors outside unsupervised in the cold and subsequently reported to police that he could not care for the minors; and (3) the minors' father had a criminal history that included domestic battery (2013) and pending domestic battery charges (2016).

¶ 5        On April 21, 2017, respondent filed her answer to the petition, denying that she was unable to care for the minors and that she had refused to take B.H. home on August 12, 2016. She, however, stipulated to the "run away" allegations.

_____

[1] Other allegations asserted in the petition were subsequently dismissed on the State's motion.

¶ 6     On June 23, 2017, the trial court held an adjudication hearing and entered an order adjudicating the minors to be neglected. The same day, the trial court held a dispositional hearing and entered a dispositional order making the minors wards of the court.

¶ 7     The record on appeal indicates that respondent and the minors' father had four kids together (B.H., W.H., So.H., and Sy.H.) and were never married. After this case was initiated, respondent and the minors' father no longer resided together, with respondent moving to Pekin, Illinois, and the minors' father remaining in Peoria, Illinois. In the dispositional report, the caseworker noted that a major trigger of stress in the home had been caring for B.H., who had autism and an intellectual disability. B.H. kept running away from home and had behavior episodes. After this case was initiated, B.H. turned 18 years old and was placed in a long-term care facility. W.H. also had autism and behavioral outbursts. It was reported that due to respondent's cognitive level, she struggled caring for W.H. in her home by herself and did not fully understand that W.H.'s behavioral outbursts were related to his autism.

¶ 8     Respondent underwent a psychological assessment, which indicated that her cognitive functioning was extremely low, she suffered from major depressive disorder, she obtained an elevated child abuse potential score, and she was in the high-risk range for behaviors associated with abuse in regard to empathy toward children's needs. It was noted in the psychological assessment report that respondent's empathy score suggested that she feared spoiling her children, their normal developmental needs were not understood or valued, she believed children must act right and be good, she lacked nurturing skills, and she may be unable to handle parenting stresses.

¶ 9     In May 2017, in the dispositional report, the caseworker recommended that W.H. (age 13) live with his father to receive one-on-one parenting and supervision and indicated that

3

respondent was capable of properly caring for the two younger minors, So.H. (age 10) and Sy.H. (age 7). However, on June 23, 2017, the caseworker filed an addendum indicating that respondent was very upset that the caseworker had recommended that W.H. live with his father. The caseworker indicated that after an hour-and-a-half meeting, respondent stated she no longer wished to speak with the caseworker and the caseworker's supervisor. The caseworker attempted to speak with respondent at her home on three subsequent occasions, but respondent purposefully did not answer the door. Respondent also did not attend her mental health treatment, as was recommended after her psychological evaluation. Respondent had not attended individual counseling since May 16, 2017, and only had attended two sessions. During those two sessions, respondent was "closed off" and indicated that she did not need help from the counseling center.

¶ 10          The addendum further indicated that respondent told the caseworker that she would slit her own throat if W.H. was allowed to live with his father. The minors' father also reported that respondent was threatening to slit her throat in front of the children, which was upsetting the children. The minors told the caseworker that respondent's behavior upset them. The minors' father reported that So.H. and Sy.H. had spent several weeks with a family from church and only spent one night sporadically with respondent. Respondent had also reportedly threatened to bruise herself so she could blame the minors' father. The minors' father reported finding W.H. in the respondent's backyard digging a hole with a knife when he went to pick him up for a weekend visit, and then found respondent inside her apartment watching television. The caseworker reported that respondent left W.H. home alone and did not understand W.H.'s need for proper supervision at all times due to his autism spectrum disorder. Due to respondent's lack of cooperation and mental instability with no further treatment, the caseworker recommended that all three minors live with their father.

4

¶ 11 The dispositional order indicated that the trial court found respondent to be unfit to care for the minors and placement with her was contrary to their health, safety, and best interests because of psychological concerns, with the trial court noting that respondent made conflicting statements and had credibility issues and the trial court was concerned about respondent's statements that she would hurt herself if the trial court did not rule in her favor. The dispositional order also indicated that the trial court found the minors' father was fit, able, and willing to care for the minors and that he would not endanger their health, safety, or well-being. Custody and guardianship of the minors were given to their father. Respondent was granted supervised visits with the minors to be monitored by DCFS.

¶ 12 As part of the dispositional order, both respondent and the minors' father were ordered to perform certain tasks to correct the conditions that led to the removal of the minors, including submitting to a psychological examination, completing a domestic violence course, completing counseling, and maintaining stable housing conducive to the safe and healthy rearing of the minors. The minors' father was additionally ordered to complete anger management counseling, while respondent was additionally ordered to complete a parenting course, comply with any medication therapy prescribed by a psychiatrist, attend scheduled visits with the minors, and demonstrate appropriate parenting conduct during visits with the minors.

¶ 13 After a permanency review hearing on February 2, 2018, the trial court entered a permanency order, which included the trial court's findings that: (1) the appropriate permanency goal was that the minors remain home with their father; (2) respondent was unfit due to "unresolved mental health issues"; (3) respondent had made reasonable efforts but not sufficient progress toward the return of the minors; (4) the minors' father was fit; (5) the service plan was appropriate and reasonably calculated to facilitate the achievement of the permanency goal; (6)

5

the permanency goal had not been achieved; and (7) placement outside the home was not necessary as to the minors' father but was necessary as to respondent. The trial court ordered that custody and guardianship of the minors remain with their father.

¶ 14        After a permanency review hearing on July 19, 2018, the trial court entered a permanency order, which included the trial court's findings that: (1) the appropriate permanency goal was that the minors remain home with their father; (2) respondent was unfit; (3) respondent had made "efforts" but not reasonable progress toward the return of the minors; (4) the minors' father was fit; (5) the service plan was appropriate and reasonably calculated to facilitate the achievement of the permanency goal; (6) the permanency goal had not been achieved; and (7) placement outside the home was not necessary, with a notation that the placement was in the "home of dad." The trial court ordered that custody and guardianship of the minors remain with their father, noted its concern about the minors' "deteriorating relationship" with respondent, and ordered family counseling to address the distrust issues the minors had with respondent.

¶ 15        On December 20, 2018, the trial court conducted another permanency review hearing. The trial court acknowledged receiving a permanency review report dated December 7, 2018, and letters submitted by respondent. In the permanency review report, the caseworker indicated that respondent had obtained part-time employment as a recess and lunchroom monitor for a primary school, respondent had adequate housing, respondent had been cooperative with the agency, respondent engaged in all recommended services (missing two family therapy sessions due to transportation issues), and respondent completed both individual parenting courses and individual counseling. Respondent's parenting course instructor reported concerns that respondent did not retain information during their sessions and had concerns "on successfully completing [respondent] from their parenting program." The parenting course instructor could

6

not state with confidence that respondent had achieved any of her written goals. Respondent participated in domestic violence counseling, with that therapist indicating she was unsure if respondent was retaining the information provided because on most occasions respondent was unable to recite the learned information or use it in her daily life. The domestic violence therapist believed that discussing parenting during respondent's sessions would be a more "useful" topic and used their last domestic violence session to prepare respondent for family therapy sessions.

¶ 16      As of June 14, 2018, respondent's visitation with the minors took place during family counseling sessions (with respondent's domestic violence counselor as the family therapist). After the second session (on June 25, 2018), respondent refused to make contact with or speak to any members of her treatment team for two months. On September 17, 2018, a new caseworker and family therapist were assigned, and family therapy sessions resumed on October 18, 2018. Respondent missed two sessions due to her taxicab not arriving to pick her up. The caseworker allowed respondent to arrange for alternate transportation and schedule additional family therapy sessions. Additional family therapy sessions took place on November 8, 2018, November 20, 2018, and November 29, 2018. The caseworker and family therapist agreed "not to make any more arrangements for further family therapy sessions until after the court hearing on December 20, 2018."

¶ 17      In the permanency review report submitted to the trial court, the caseworker reported that she and the family therapist believed there had been no progress made in family therapy sessions due to respondent's lack of understanding of the children's needs and respondent's lack of an ability to demonstrate attachment skills. Family therapy was, therefore, discontinued for the best interests of the children. Attached to the permanency review report was a report from the family therapist, in which she stated, in relevant part, as follows:

"There has been a significant lack of progress in treatment. Children participate in session, but are highly resistant to make eye contact, physical touch, or laugh with mom. Despite being given opportunity to learn and implement attachment skills, mom struggles to demonstrate ability to understand the concepts and implement the skills consistently. My concerns going forward is that continuing family sessions will [be] unproductive, and possibly more harmful to the children and their relationship with [respondent]. It is my recommendation that family therapy be discontinued."

¶ 18    The Court Appointed Special Advocate (CASA) supervisor reported that 14-year-old W.H., 10-year-old So.H., and 8-year-old Sy.H. appeared happy and healthy. W.H. reported to the CASA supervisor that he did not feel comfortable or safe around his mother, did not believe respondent had his best interest in mind, felt as though respondent was an acquaintance and not his mother, and did not wish to continue to spend time with respondent because she did not tell the truth and seemed capable of hurting him if he were left alone with her. So.H. reported to the CASA supervisor that she loved living with her father because she had more freedom to sign up for after school activities and felt supported by her father to start making her own decisions. So.H. also felt that respondent was dishonest and lied about her and her siblings, she was happy with her dad at his house, she liked her school in Peoria, and she wished to remain in her father's care. Sy.H. was fearful of being left alone with respondent. Sy.H. was described by the CASA supervisor as being very quiet and as shutting down when asked about her therapy sessions with respondent. Sy.H. reported that she was happy at her father's house and was excited to change schools next year to be with So.H.

¶ 19        The caseworker's assessment in the permanency review report indicated that permanency for the minors had been achieved for almost a year with their father and that the case had been extended in an attempt to allow respondent another opportunity to make progress in understanding her children's needs and feelings. The caseworker indicated that the minors remained safe and were well taken care of with their father and their father had shown great progress in his parenting skills. The caseworker recommended in the report that wardship of each minor be terminated and that guardianship and custody remain with their father.

¶ 20        Respondent submitted several letters to the court to support her contention that she had made reasonable progress. One letter was from a school counselor, in which he indicated that W.H. was successful in passing the eighth grade and building friendships with his peers and had showed up to school with clean clothes, combed hair, and having been fed. The counselor indicated that respondent communicated with the school regarding any of W.H.'s outside appointments, with W.H. attending class before and after those appointments. The counselor noted that respondent was polite and communicated well with school staff, respondent was on time for school conferences even though transportation was not always easily available, and respondent always made sure to understand what was required of W.H. Another letter was submitted from a local attorney, who indicated that she had interacted with the minors' as part of a church outreach program and had observed that respondent had been actively involved with the minors on a regular basis, attentive and encouraging with the minors, and concerned for their well-being. The attorney also stated that she "hesitate[d] to make a comparison to other families who live at [the Pekin Housing Authority complex], but if you had asked [her] which families would be involved with DCFS, [respondent] and her children would have been at the bottom of [her] list." Respondent's mental health therapist authored a letter indicating that respondent had

been engaged in individual therapy biweekly for 19 months and had made "good progress toward her goals that were set thus far in counseling." The therapist indicated that respondent was doing "much better with coping with her depression and reducing depressive symptoms." The therapist indicated she had seen an improvement in respondent's mood and that future counseling was not needed. Respondent's employer submitted a letter indicating that respondent had a work evaluation on December 6, 2018, and respondent was "performing great" at supervising kindergarten through third grade students during lunch.

¶ 21 At the permanency review hearing, the State argued that the minors' father should remain as their guardian and custodian and the case should be closed. The attorney for the State further argued that respondent was "unable" to care for the minors due to her mental health. The attorney for the minors' father argued that permanency had been achieved and that the case had remained open at the prior permanency review hearing just for respondent to get additional services upon the recommendation of her therapist for an additional six months of counseling. The attorney for the minors' father stated, "[i]f the parties want to go fight this out in family court, they can," and requested that the case be closed.

¶ 22 Respondent's attorney acknowledged that there had been five family counseling sessions and that the family counselor had concluded that family counseling was unproductive and possibly harmful. He argued that respondent had steady work, was "thriving," was "performing great," and had successfully completed individual counseling. He noted that the kids were originally in a situation where they were with respondent, loved respondent, and had a good relationship with respondent, but there had been concerns of neglect, after which time the minors were placed with their father and "all of a sudden they hate their mother." Respondent's attorney argued that continued family counseling was necessary or, in the alternative, for the case to be

10

closed with an indication that respondent was fit. Respondent's attorney argued further that respondent had done everything that had been asked of her and suggested that respondent having visitation outside the clinical setting could be "instructive" if the trial court was not "inclined to say that she's fit."

¶ 23 The guardian *ad litem* agreed that respondent had made progress in individual counseling but noted that there had not been progress in the family counseling due to respondent's lack of understanding of the children's needs and her lack of an ability to demonstrate attachment skills. The guardian *ad litem* noted that the family counselor had recommended that family counseling be discontinued in the best interests of the minors. The guardian *ad litem* stated, "so, unfortunately, we have a case here where I do believe that she is unable" and "[f]or whatever reason she just is not able to make the connection and do what's necessary for the children." The guardian *ad litem* suggested that respondent be found unable and the case be closed because permanency had been achieved with the minors' father.

¶ 24 The trial court found that respondent had "done all that she can do" and was not making any further progress with respect to her interaction with the children. The trial court stated, "my finding would be that she's unable due to some mental health issues, I'm not sure what, but due to those." The trial court continued guardianship and custody of the minors with their father and terminated wardship. Respondent appealed.

¶ 25                                    II. ANALYSIS

¶ 26 On appeal, respondent argues that trial court erred by finding that she was "unable" to care for the minors before terminating wardship of the minors and closing the case. Respondent contends that the trial court finding her "unable" was against the manifest weight of the evidence where she completed numerous services that were required of her—completing individual

11

counseling, parenting courses, and a domestic violence course; obtaining suitable housing; cooperating with DCFS; and attending visits with the minors. Respondent argues family counseling was not ordered until July 31, 2018, and she had completed five of those sessions before the final permanency review hearing on December 20, 2018. Respondent also takes issue with the trial court finding her unable to care for the minors due to mental health issues when the trial court seemed to indicate it did not know what those mental health issues were. Respondent further takes issue with the trial court's written finding that she was making no progress, which respondent argues was contrary to the evidence presented. Respondent requests that this court reverse its finding that respondent was unable or, in the alternative, remand with directions to the trial court to make more specific findings. The State argues that the trial court's finding respondent was unable was not against the weight of the evidence.

¶ 27        Pursuant to the Juvenile Court Act of 1987 (Act), once a minor is made a ward of the court, the court must determine the disposition that best serves the health, safety, and interests of the minor and the public. 705 ILCS 405/2-22(1) (West 2018). Pursuant to the Act, at the dispositional hearing, the court shall determine:

> "whether it is in the best interests of the minor and the public that he be made a ward of the court, and, if he is to be made a ward of the court, the court shall determine the proper disposition best serving the health, safety and interests of the minor and the public. The court also shall consider the permanency goal set for the minor, the nature of the service plan for the minor and the services delivered and to be delivered under the plan. All evidence helpful in determining these questions, including oral and written reports, may be admitted and may be relied

12

upon to the extent of its probative value, even though not competent for the purposes of the adjudicatory hearing." 705 ILCS 405/2-22(1) (West 2018).

¶ 28      Section 2-28 of the Act governs court proceedings in which the original dispositional order is reviewed (permanency review hearings). 705 ILCS 405/2-28 (West 2018); *In re M.G.*, 2018 IL App (3d) 170591, ¶ 13 (permanency review hearings pursuant to section 2-28 of the Act are further dispositional hearings that are conducted in accordance with section 2-22(1) of the Act regarding dispositional hearings). "At the permanency hearing, the court shall determine the future status of the child." 705 ILCS 405/2-28(2) (West 2018).

¶ 29      In this case, at the dispositional hearing, the minors were made wards of the court and were placed in the custody and guardianship of their father in accordance with section 2-23(1) of the Act. 705 ILCS 405/2-23(1) (West 2016) (the trial court can choose from four types of dispositional orders with respect to a ward of the court, including to continue in the care of the minor's parent, guardian, or legal custodian). At the final permanency review hearing, the trial court found that respondent was unable to care for the minors, continued custody and guardianship with their father (who the trial court found to be fit), and terminated wardship of the minors.

¶ 30      Here, the trial court's finding that respondent was unable to care for the minors was not against the manifest weight of the evidence. See *In re April C*., 326 Ill. App. 3d 245, 257 (2001) (a reviewing court will reverse a trial court's dispositional findings when they are against the manifest weight of the evidence or the trial court abused its discretion in fashioning an improper dispositional order). The record shows that respondent was unable to care for all three of the minors by herself. Initially the caseworker recommended that W.H. live with his father and Sy.H. and So.H. live with respondent until respondent threatened to harm herself in front of the

13

minors. The record shows that respondent was cooperative with her treatment team at times, and other times she was not. The trial court ordered family counseling on July 19, 2018, respondent attended two family therapy sessions, and, thereafter refused to speak with her treatment team for two months. Family therapy did not resume until October 2018. In the family therapy sessions, respondent demonstrated an inability to empathize with the minors, which is of great significance where her psychological assessment indicated she had an elevated child abuse potential score and was in the high-risk range for behaviors associated with abuse as a result of her lack of empathy toward the needs of the children. Although respondent completed many of required services, she did not retain or apply information from the parenting and domestic violence counseling sessions. The record demonstrates an inability on the part of respondent to learn and/or apply concepts from her required services and that the provided services were, therefore, unsuccessful in regard to how respondent related to the minors. Accordingly, we disagree with respondent's contention that the record does not support the trial court's finding that respondent made no further progress.

¶ 31       We, therefore, conclude that trial court's finding that respondent was unable to care for the minors was not against the manifest weight of the evidence. See *In re D.F.*, 201 Ill.2d 476, 498 (2002) (a finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or the finding is unreasonable, arbitrary, or not based on the evidence). We, thus, affirm the trial court.

¶ 32                                    III. CONCLUSION

¶ 33       The judgment of the circuit court of Tazewell County is affirmed.

¶ 34       Affirmed.

14