2026 IL App (4th) 250749-U

NOS. 4-25-0749, 4-25-0750, 4-25-0751, 4-25-0849, 4-25-0929 cons.

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 10, 2026
Carla Bender
4th District Appellate
Court, IL

| | |
|---|---|
| *In re* K.W., a Minor | Appeal from the |
| | Circuit Court of |
| (The People of the State of Illinois, | Winnebago County |
|       Petitioner-Appellee, | Nos. 24JA332 |
|       v.    (No. 4-25-0749) | 24JA333 |
| Andre W., | 24JA334 |
|       Respondent-Appellant). | 24JA337 |
| | 24JA338 |

---

*In re* Al. W., a Minor

(The People of the State of Illinois,
      Petitioner-Appellee,
      v.    (No. 4-25-0750)
Andre W.,
      Respondent-Appellant).

---

*In re* An. W., a Minor

(The People of the State of Illinois,
      Petitioner-Appellee,
      v.    (No. 4-25-0751)
Andre W.,
      Respondent-Appellant).

---

*In re* Emo. W., a Minor

(The People of the State of Illinois,
      Petitioner-Appellee,
      v.    (No. 4-25-0929)
Andre W.,
      Respondent-Appellant).

---

| | | | |
|---|---|---|---|
| *In re* Emi. W., a Minor | ) | | |
| | ) | | |
| (The People of the State of Illinois, | ) | | |
| Petitioner-Appellee, | ) | | |
| v. (No. 4-25-0849) | ) | Honorable | |
| Andre W., | ) | Erin B. Buhl | |
| Respondent-Appellant). | ) | Judge Presiding. | |

JUSTICE LANNERD delivered the judgment of the court.
Justices Knecht and Grischow concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Respondent failed to establish the trial court's adjudicatory orders were against the manifest weight of the evidence.

¶ 2     In September 2024, the State filed petitions to adjudicate the minors at issue in this case as either abused or neglected under section 2-3 of the Juvenile Court Act (Act) (705 ILCS 405/2-3 (West 2024)). The petition regarding Emo. W. alleged she was an abused minor because her father, respondent Andre W., inflicted excessive corporal punishment on her by choking her and threatening to strike her with his fist. The petitions regarding the other minors at issue in this appeal (K.W., Al. W., An. W., and Emi. W.) alleged they were neglected because their environment was injurious to their welfare because respondent committed acts of excessive corporal punishment against Emo. W., placing each minor at a risk of harm (*id.* § 2-3(1)(b)), and performed acts of domestic violence in the presence of the minors, placing each minor at a risk of harm (*id.*).

¶ 3     On June 18, 2025, the trial court adjudicated K.W., Al. W., An. W., and Emi. W. as neglected minors and Emo. W. as an abused minor. On July 16, 2025, the court entered a dispositional order regarding K.W., Al. W., and An. W. Those children were not made wards of the court. The court found Ciara W. (K.W., Al. W., and An. W.'s mother) and respondent to be fit, willing, and able to care for the children. Guardianship and custody of the children remained with

Ciara and respondent. Respondent filed appeals in those three cases.

¶ 4 On August 12, 2025, the trial court entered a dispositional order for Emi. W. The court found Shenedra J. (Emi. W. and Emo. W.'s mother) and respondent to be fit, willing, and able to care for Emi. W. The order indicated guardianship and custody of Emi. W. remained with her parents. However, the court made Emi. W. a ward of the court until age 21 unless the wardship was terminated earlier. Respondent also filed an appeal in that case.

¶ 5 On August 29, 2025, the trial court entered a dispositional order for Emo. W. The court found Shenedra J. to be fit, willing, and able to care for, protect, train, and/or discipline Emo. W. However, the court found respondent to be unfit or unable for some reason other than financial circumstances alone to care for, protect, train, or discipline Emo. W. The court made Emo. W. a ward of the court until age 21 unless the wardship was terminated earlier by the court. The court placed custody and guardianship of Emo. W. with Shenedra J. Once again, respondent filed an appeal in that case.

¶ 6 This court allowed respondent's motions to consolidate those appeals. Now, in his consolidated appeal, respondent claims the trial court's adjudicatory order finding he abused Emo. W. when he choked her, which amounted to excessive corporal punishment, was against the manifest weight of the evidence. Then, assuming, *arguendo*, this court agrees with his claim, respondent asserts the trial court's other adjudicatory orders involving the other children are also against the manifest weight of the evidence because those orders were solely based on his alleged abuse of Emo. W. Respondent does not make any other independent argument regarding the court's dispositional orders. Based on respondent's claim before this court, we affirm the trial court's orders in these consolidated cases.

¶ 7         I. BACKGROUND

¶ 8                                    A. State's Petitions

¶ 9          On September 24, 2024, the State filed petitions to adjudicate the children at issue in this consolidated appeal as either abused or neglected under section 2-3 of the Act (*id.* § 2-3). The State alleged Emo. W. (born in February 2010) was an abused minor pursuant to section 2-3(2)(v) of the Act (*id.* § 2-3(2)(v)) because respondent inflicted excessive corporal punishment on her by choking her and threatening to strike her with his fist. The State alleged the other children at issue in this consolidated appeal (K.W. (born in February 2022), Al. W. (born in December 2019), An. W. (born in November 2017), and Emi. W. (born in July 2008)) were neglected pursuant to section 2-3(1)(b) of the Act (*id.* § 2-3(1)(b)) because the minors were in an environment injurious to their welfare because respondent committed an act of excessive corporal punishment against Emo. W. (count I) and performed acts of domestic violence in the presence of the respective minors (count II).

¶ 10                                   B. Family Information

¶ 11         The minors in this consolidated appeal did not all share the same mothers. Respondent and Shenedra are the parents of Emi. W. and Emo. W. Respondent and Ciara are the parents of K.W., Al. W., and An. W. In addition, Ciara had two other children, R.B. (born in December 2010) and N.A. (born in December 2009), who were also subject to neglect petitions. However, because respondent was not the father of R.B. or N.A., those two children are not subjects of this appeal. At the time of the incident at issue on appeal, respondent, Ciara, and all the children were living together in Rockford, Illinois. Shenedra resided in Louisiana.

¶ 12                    C. Proceedings Before the Adjudicatory Hearing

¶ 13         On September 24, 2024, the trial court entered an order giving temporary custody of the children on an emergency basis to the guardianship administrator of the Illinois Department

of Children and Family Services (DCFS). On September 26, 2024, in an addendum statement of facts filed with the court, DCFS alleged respondent had been advising Emi. W. via text to talk to "CPI" about the cases and telling her to tell "CPI" that she "didn't believe [respondent] did what he was accused of" and to delete his text messages.

¶ 14    On September 27, 2024, based on an agreement by the parties, the trial court granted temporary custody of Emi. W. and Emo. W. to their mother, Shenedra, and ordered respondent to have no unsupervised contact and no "texting" with Emo. W. and/or Emi. W. The court indicated it would not allow any attempts by respondent to coerce, manipulate, or control the children. Further, the court warned it could make an inference that the underlying incident occurred "based on the behavior and communication demonstrated afterward." Ciara was given temporary custody of the remaining children, but respondent was ordered out of the home. The court also informed the parties that information learned during court proceedings was confidential and not to be discussed publicly.

¶ 15    At a hearing on November 6, 2024, before a different judge, the State indicated the DCFS casework team had made a request to allow respondent to move back into the home with Ciara, their three children, and Ciara's other two children based on respondent's statements regarding the financial burden caused by his removal. Neither the State nor the guardian *ad litem* (GAL) objected to respondent returning to the home with Ciara and the younger children. The trial court allowed respondent to return to the residence.

¶ 16    On November 21, 2024, the State informed the trial court respondent and Emi. W. had the following text message exchange, which was read into the record as follows:

> " 'Did you do what Ciara told you? Yes, sir. You talked to the counselor? No, not yet. Want me to go now? Yes. And start crying and make them know you don't

want to be here—you don't want to be there. Delete these messages now.'

There are some other—there's a whole other—some sections but it does indicate, 'I'm going to text her, but if you show our text, I'm going to get in trouble and you won't be able to come back.' "

The court then told respondent it had been very clear on this issue and barred him from communicating with Emo. W. or Emi. W. via text. Further, the court indicated any phone calls between respondent and Emo. W. and/or Emi. W. were to be over speakerphone in Shenedra's presence. The court threatened to jail respondent if it learned he was discussing the case with Emo. W. or Emi. W. and again advised him that it could make inferences based on his behavior.

¶ 17    On February 19, 2025, the GAL informed the trial court that respondent made a post in a Facebook group called Family Forward Project. Emo. W. was aware of and upset over the post and comments calling her a liar. The GAL stated respondent was attempting to try the case outside the court and was making derogatory comments about the court, the judge, and the children. The court then told respondent it had no problem with him expressing his displeasure with the court. However, the court stated the children deserved privacy and respondent "stepped over the line" by calling Emo. W. a liar. Once again, the court admonished respondent that it could potentially make an inference that he was trying to influence his daughter's testimony by calling her a liar. While the court did not hold respondent in contempt, it warned him again not to attempt to litigate this case on social media.

¶ 18                          D. Adjudicatory Hearing

¶ 19    On March 13, 2025, at the adjudicatory hearing, the trial court allowed the State to strike its allegation that respondent threatened to strike Emo. W. with his fist. The State then called a DCFS child protection specialist, Daisy Dorantes, as its first witness. Dorantes, who had been

working at DCFS for 20 months, testified she went to Emo. W.'s high school on September 20, 2024, after DCFS received a hotline call. Dorantes spoke with Emo. W. about what had transpired at Emo. W.'s home during the late evening hours of September 19 into September 20, 2024. During their conversation, Emo. W. was crying and would often put her head down and shake her head.

¶ 20 According to Dorantes, Emo. W. indicated she was crying in the bathroom. Respondent asked her what was wrong. She initially said nothing was wrong but eventually told respondent she and her girlfriend were fighting. Respondent asked to see her phone, but she refused to give him the phone. Instead, she asked what she had done wrong. Respondent also asked for the passcode for her phone. Emo. W. again refused to comply. During the incident, Emo. W. was wearing a purple Nike sports bra. Respondent pinned her to the wall by the straps of her sports bra, and Emo. W. could not feel the ground. Respondent again asked for the passcode and put his forearm into her neck. Emo. W. said she started tapping on respondent's hand and told him she could not breathe. Respondent then let her go and asked for the passcode again before putting his forearm back into her neck. When he let her go the second time, Emo. W. ran to Ciara's room and told her respondent choked her. Respondent followed Emo. W. to the bedroom and stated, " 'I didn't choke you.' " Ciara then told respondent he could not be doing that because he could go to jail. Respondent told her no one would believe Emo. W. When Emo. W. continued to refuse to give respondent her passcode, respondent threatened to whip her with a belt but did not follow through on his threat.

¶ 21 Dorantes also testified she spoke with Emi. W. at the school. According to Dorantes, Emi. W. said she heard Emo. W. tell respondent he was choking her. Emi. W. said he responded, " 'I am not choking you.' " Emi. W. also said she shut her bedroom door because she could not do anything to help her sister.

¶ 22        According to Dorantes, she took Emo. W., Emi. W., and their stepsister to a DCFS field office in Rockford. Dorantes then went to respondent's residence. An additional DCFS case aide and two police officers also went to the home. Ciara answered the door and was cooperative. Respondent then arrived home. He was yelling, crying, and threw himself on the ground. He denied the allegations against him. A decision was made to take all the children into protective custody. Respondent said he only put his hand out in an attempt to block Emo. W. when she left the bathroom. He also told Dorantes he found messages on Emo. W.'s phone where Emo. W. and her girlfriend were talking about each other's vaginas and masturbating over FaceTime together.

¶ 23        Dorantes testified all the children were removed from the home and placed with a member of Ciara's family.

¶ 24        Emo. W. testified she was 15 years old and resided with her mother, Shenedra, in Louisiana but had lived with respondent, Ciara, and her sisters and brother in Rockford when the incident at issue occurred. Based on Emo. W.'s testimony, it is not clear when she finally turned over her phone to respondent during the confrontation. However, even after respondent had the phone, Emo. W. still refused to provide him with the passcode for the phone.

¶ 25        According to Emo. W., during the confrontation with respondent in the bathroom, she tried to leave the room. However, respondent would not let her out. When she eventually got out of the bathroom, respondent pulled her "up by [her] sports bra strap thingy," "put [her] against the wall," and had his arms on her neck. She testified she did not say anything until respondent put her down. She then screamed, " 'You choked me.' " He then responded, " 'Yeah, the F I did.' " Emo. W. was then asked whether respondent choked her when he grabbed her by the bra. She responded, "I wouldn't call it—I don't know how to explain it. I—because I couldn't feel anything. I couldn't really think. I was just—I wasn't thinking. I wasn't …" Emo. W. said she told Ciara that

respondent just choked her, which respondent denied.

¶ 26 Emo. W. testified she, respondent, and Ciara then went into the living room. Respondent continued to yell at her and deny her accusations. At that point, respondent had Emo. W.'s phone, but she would not give him the passcode. Respondent then called Shenedra. Emo. W. said she did not hear any of that conversation. He then called Ciara's mother. Emo. W. then heard respondent say he was going to beat her if she did not tell him her password. Emo. W. then spoke with Ciara's mother and told her she had not done anything wrong, but she gave her the passcode. Her "grandma" then relayed the passcode to respondent.

¶ 27 When questioned by respondent's attorney, Emo. W. admitted respondent had a rule allowing him to look at her cell phone at any time. However, on the night at issue, she did not believe he had a reason to take her phone. She also stated she did not try to keep respondent out of the bathroom. When she later left the bathroom, respondent tried but did not stop her. However, when she was in the hallway, respondent stopped her by grabbing the straps of her bra. She testified it felt like respondent choked her in the hallway. She indicated she usually has trouble breathing when she cries and was "kind of" having trouble breathing prior to respondent confronting her in the hallway.

¶ 28 Emo. W. also testified she did not remember if respondent applied pressure to her neck that night but asserted he only pinned her against the wall one time that night. She remembered yelling at him that he choked her after he had let her down. According to Emo. W., after respondent had the passcode for the phone, he yelled at her about what was on the phone but did not hit or choke her.

¶ 29 Emo. W. acknowledged she had told respondent many times that she wanted to live with her mother. When asked why, Emo. W. said respondent "wouldn't let [her] out with friends"

and kept her "locked in the house all the time." Emo. W. said she felt like she could be happy with her mother and talk to her about things. She said respondent did not remain calm when he talked and she could not express her feelings to him.

¶ 30    When questioned by her mother's attorney, Emo. W. indicated respondent used her sports bra to control her movement but did not remember if he had violently put her up against the wall. She indicated part of respondent's hands or arms were against her neck but did not remember if any part of his hands or arms caused pressure against her neck. When asked if she looked at herself in the mirror after things had calmed down in the house that night, Emo. W. said she did but did not see any marks anywhere on her person. According to Emo. W., she did not look at her body the next day, but her head hurt, she had no energy, and she was unusually stiff. Emo. W. agreed she told multiple people the day after the incident that respondent choked her, which she believed at the time. Emo. W. said she was "not making up a story" the day after the incident.

¶ 31    Emi. W. testified she was 16 years old and currently living in Louisiana with her mother, stepfather, and Emo. W. During the incident at issue between respondent and Emo. W., Emi. W. was in her bedroom working on her stepsister's hair. She heard Emo. W. and respondent arguing after respondent asked to see Emo. W.'s phone, which she refused to give him. She also heard her sister say, " '[Y]ou're choking me,' " but she did not see the incident or respondent choke Emo. W. When asked what she heard respondent say during the incident, Emi. W. testified respondent said, " 'I damn sure did,' " after Emo. W. said he choked her. Later, Emi. W. heard respondent say he did not choke Emo. W. When asked whether respondent was upset because Emo. W. had a girlfriend, Emi. W. said she did not think he was really upset but was probably disappointed because "she's on drugs."

¶ 32    Emi. W. said respondent texted her once after the incident and said she would need

to tell the truth if she wanted to come back to his house. When questioned by respondent's attorney, Emi. W. testified respondent had a rule that the children had to let him check their phones if he asked. Emi. W. also testified respondent did not ask her to lie. Further, according to Emi. W., Emo. W. did not frequently have outbursts but did sometimes exaggerate things.

¶ 33 Officer Alexander Fuller of the Rockford Police Department testified he was the school resource officer at Emo. W.'s high school. According to Fuller, Emo. W. told him that respondent grabbed her by her sports bra after she left the bathroom, pushed her against a wall, and put his forearm into the area of her throat. She also indicated she told respondent he was choking her and she could not breathe. Emo. W. said he responded, "[Y]eah, I know the fuck I did." Emo. W. indicated she then ran into Ciara's bedroom and told her what happened. Respondent then denied her allegations, but he later admitted what she said was correct and said no one would believe Emo. W. Officer Fuller's body camera recorded his conversations with Emo. W. and Emi. W. He also indicated Emo. W. did not have any visible injuries.

¶ 34 Officer Brian Squires of the Rockford Police Department assisted DCFS in taking the children into protective custody at respondent's home. While Squires was at the home, respondent ran up to the residence and "was distraught, crying, almost hyperventilating, to the point [Squires] thought he was going to fall to the ground, yelling, and just pleading his case to DCFS." When the DCFS worker told respondent the children were being taken into protective custody, respondent became very upset, fell to the ground, shouted he was a good father, and questioned why DCFS was taking his children. Squires testified his body camera recorded what happened at the scene.

¶ 35 Detective Melissa Sundly of the Rockford Police Department testified she conducted a recorded interview with respondent on October 16, 2024. During the interview,

respondent stated he had a rule that he could look at any of his children's phones at any time. When Emo. W. was upset in the bathroom, he wanted to see her phone because he was concerned about what she was doing on the phone, but she refused. Respondent stated he was concerned Emo. W. had inappropriate things on her phone that she did not want him to see. When Emo. W. tried to leave the bathroom, respondent said he tried to stop her by using his hip and leg and demonstrated what he did. The detective testified respondent indicated and demonstrated that he extended his right arm in front of him, with his arm from his elbow to his fingertips parallel to the floor. However, respondent said Emo. W. continued to resist giving him her phone. Eventually, respondent said he retrieved the phone and backed away from Emo. W. Respondent testified he then asked Emo. W. to give him her passcode for the phone, but she refused. She then ran to the bedroom and stated her version of events to Ciara, which he denied. According to respondent, Emo. W. eventually provided the passcode to the phone to her "grandmother," who then gave the passcode to him. Respondent told the detective Emo. W. had media on the phone that could constitute child pornography. He also denied choking Emo. W.

¶ 36       Respondent testified he heard Emo. W. crying in the bathroom and asked if she was okay. She said she was, but he could still hear her crying. He opened the bathroom door and observed her crying. After asking several times what was wrong, he told Emo. W. he was not going to ask her again. She then said she had been in an argument with her girlfriend. Respondent testified he did not have a problem with Emo. W. dating a girl or a boy if she was mature enough to handle the responsibilities she already had. He testified he was upset that night when Emo. W. said she was arguing with her girlfriend because she had not finished her household chores. Respondent also testified the children were not to be on their phones, which he could randomly check, after 10 p.m.

¶ 37 Respondent testified he asked to see Emo. W.'s phone, but she refused to give it to him. This made him believe she was trying to hide something. After he asked for the phone four or five times, Emo. W. tried to run out of the bathroom and down the hall. Respondent said he tried to block her from running down the hallway by extending his knee and leaning to the right. Even then, she still refused to give him her phone. After he took the phone, she ran down the hall alleging he choked her and was trying to kill her.

¶ 38 According to respondent's testimony, he did not choke Emo. W., press his arm against her throat, or grab her clothes. He denied that Emo. W. said she could not breathe. Respondent also denied that he told Ciara that he choked Emo. W. but no one would believe his daughter. Respondent indicated that even after he had Emo. W.'s phone, she refused his multiple demands to give him her passcode. While respondent admitted telling Emo. W., " 'I'm going to whoop your butt if you don't give me the passcode,' " he claimed this was just a scare tactic. He said his children all know he would not put his hands on them. Further, he denied ever using any kind of object to discipline his children.

¶ 39 Finally, respondent admitted sending text messages to Emi. W. before the shelter care hearing in this case, telling Emi. W. to lie and say they had not communicated, and also telling her to delete his text messages.

¶ 40 The State did not call either Shenedra or Ciara to testify during the adjudicatory hearing.

¶ 41 On June 18, 2025, the trial court allowed the State to file a first amended petition in Emo. W.'s case, adding a count alleging she was neglected because her environment was injurious to her welfare due to respondent committing domestic violence in her presence, placing

her at risk of harm. The court indicated the new count mirrored the language in the second count of the other petitions.

¶ 42        After noting it had considered the evidence and testimony presented during the adjudicatory hearing, the trial court found the State had proved by a preponderance of the evidence that the children were neglected and Emo. W. was also abused, finding respondent physically abused her. According to the court, Emo. W.'s testimony was "credible, consistent, and corroborated by her prior statement." In addition, after observing Emo. W.'s and Emi. W.'s appearance and demeanor both during the adjudicatory hearing and their recorded interviews at the school, the court found the girls were afraid of respondent when they were interviewed at the school.

¶ 43        In explaining its decision, the trial court stated respondent was angry on the night in question because Emo. W. had refused to follow several of his rules. She first refused to give him her cell phone, even though he asked for it several times. Then, after finally giving him her cell phone, she still refused to give him her passcode. As for what happened in the hallway between respondent and Emo. W., the court stated Emo. W. consistently claimed respondent lifted her up against the wall and placed his forearm against her neck or upper chest area, impacting her breathing, during both the adjudicatory hearing and while speaking to DCFS and the police after the incident. The court also pointed to Emi. W.'s testimony she heard Emo. W. yell that respondent choked her and respondent say something to the effect of, "I damn sure did." In addition, the court did not find respondent's testimony credible. While respondent admitted yelling, "I sure the fuck did," at Emo. W., the court found his explanation that he made this statement in response to Emo. W. saying he took her phone away implausible and not consistent with the environment and other credible evidence presented.

¶ 44 The trial court also noted respondent threatened to beat Emo. W. with a belt if she did not give him her passcode and Emi. W. said he came into her room looking for a belt. Respondent failed to mention this to either DCFS or the police until he was directly questioned about it. The court also found respondent appeared dishonest during his recorded interview with Detective Sundly regarding his disclosures to Dorantes and the police when they were taking protective custody of his children, what had occurred in court, and his communication with Emi. W. In addition, the court found respondent's explanation for sending text messages to Emi. W. was not credible, finding he sent the messages for his own benefit.

¶ 45 According to the trial court, respondent's actions were "permeated by power and control tactics." Given the totality of the circumstances, the court found his response to Emo. W.'s actions was excessive, noting that once he had the phone in his possession, he did not have an urgent need to determine what was on the phone. Further, regardless of what was on the phone, respondent engaged in extreme and unnecessary conduct when he put Emo. W. against the wall and choked her. In addition, the court noted the presence of the other children during the incident was uncontested. According to the court, "Given the ongoing nature of this altercation throughout the home, including actual physical violence to [Emo. W.] which impacted her ability to breathe, I find that [respondent] also created an injurious environment rising to the level of neglect as to the other children that were present in the home."

¶ 46 E. Dispositional Proceedings

¶ 47 On July 16, 2025, the trial court held a dispositional hearing. The parties requested a settlement conference with regard to the children. After the settlement conference, the court gave the attorneys the chance to speak with their respective clients. The State then informed the court the parties had an agreement, subject to the court's approval, with regard to all of Ciara's children.

Under the terms of the agreement, both respondent and Ciara would be found fit, willing, and able to care for the children and guardianship and custody of those minors would remain with respondent and Ciara. After questioning respondent and Ciara, the court accepted the agreement and closed the cases involving all of Ciara's children. The parties also indicated they were in agreement a dispositional hearing for Emo. W. and Emi. W. would still need to be held.

¶ 48      On August 12, 2025, the State told the trial court the parties had agreed respondent and Shenedra were fit, willing, and able to care for Emi. W. and guardianship and custody of her would be returned to the parents. In addition, Emi. W. had expressed a desire to return to Rockford to finish her senior year of high school. The court accepted the agreement and vacated its prior order from November 2024 regarding respondent's contact with Emi. W. However, the court ordered Emi. W. would be a ward of the court until she was 21.

¶ 49      As for Emo. W., the GAL indicated she wanted to remain in Louisiana with Shenedra. The State asked the trial court to find Shenedra fit, willing, and able to care for Emo. W. and to give her guardianship and custody of Emo. W. However, the State requested respondent be found unfit or unable to care for, protect, train, or discipline Emo. W. The State noted its concern respondent did not acknowledge his fault in the incident leading to DCFS's involvement with Emo. W., which could pose a barrier to the children remaining in intact status if another incident occurred in the future. The court took Emo. W.'s case under advisement.

¶ 50      On August 29, 2025, the trial court held a hearing to discuss its dispositional order regarding Emo. W. The court found Emo. W.'s mother, Shenedra, to be fit, willing, and able to care for Emo. W. and respondent to be unfit or unable to care for, protect, or train Emo. W. In addition, the court found it was in Emo. W.'s and the community's best interests that Emo. W. remain a ward of the court until she was 21.

¶ 51        This consolidated appeal is now before this court.

¶ 52                        II. ANALYSIS

¶ 53        We must first address the delay in the issuance of this order. As a matter addressing the custody of minors, this case is subject to expedited disposition under Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), requiring the appellate court to issue its decision within 150 days after the filing of a notice of appeal, except for good cause shown. Here, the notices of appeal were filed July 22, 2025, for K.W., Al. W., and An. W.; August 13, 2025, for Emi. W.; and September 2, 2025, for Emo. W. Our decisions were therefore due December 19, 2025, January 12, 2026, and January 30, 2026, respectively. However, counsel filed several requests for extension of time, as well as a request for oral argument, which needed to be scheduled and held. Although every effort was made to comply with the deadline under Rule 311(a)(5), we find good cause exists for filing this decision beyond the deadline.

¶ 54        On appeal, respondent claims the trial court's adjudicatory orders were against the manifest weight of the evidence. Other than stating the court's dispositional orders must be vacated if this court determines the adjudicatory orders were against the manifest weight of the evidence, respondent did not present any argument challenging the court's dispositional orders.

¶ 55                   A. General Principles of Law

¶ 56        "A proceeding for adjudication of wardship 'represents a significant intrusion into the sanctity of the family which should not be undertaken lightly.' " *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004) (quoting *In re Harpman*, 134 Ill. App. 3d 393, 396-97 (1985)). The Act sets forth the procedure the trial court must follow in determining "whether a minor should be removed from his or her parents' custody and made a ward of the court." *In re A.P.*, 2012 IL 113875, ¶ 18.

¶ 57         After the State files a petition for adjudication of wardship, the trial court must hold

an adjudicatory hearing, where the State presents evidence in support of its petition. *In re Jay. H.*,

395 Ill. App. 3d 1063, 1068 (2009). The burden is on the State to prove the allegations in its petition

by a preponderance of the evidence. *In re S.R.*, 349 Ill. App. 3d 1017, 1020 (2004). "In other words,

the State must establish that the allegations of neglect [or abuse] are more probably true than not."

*A.P.*, 2012 IL 113875, ¶ 17. If the trial court determines the State has proven by a preponderance

of the evidence the minor is abused or neglected, the case proceeds to a dispositional hearing. *Jay.*

*H.*, 395 Ill. App. 3d at 1068.

¶ 58                              B. Standard of Review

¶ 59         This court will not disturb a trial court's finding of abuse or neglect unless the

finding is against the manifest weight of the evidence. *A.P.*, 2012 IL 113875, ¶ 17. "A finding is

against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Id.*

This is a difficult standard to meet.

¶ 60         Respondent's argument centers on the trial court's credibility determinations. This

court will not overturn a trial court's findings that are based on its credibility determinations merely

because we may have reached a different result. *In re April C.*, 326 Ill. App. 3d 245, 257 (2001).

Because the trial court can actually observe the witnesses testify, it is in the best position to assess

the credibility of those witnesses. *Id.*

¶ 61                              C. Adjudicatory Orders

¶ 62         In claiming the trial court's adjudicatory orders are against the manifest weight of

the evidence, respondent takes issue with a few specific parts of the court's reasoning in finding

Emo. W. was abused. First, he points to the court's finding Emo. W.'s testimony was credible and

consistent with her prior statements. According to respondent, Emo. W.'s testimony was not

entirely consistent with her prior statements. He also states, "[I]t is difficult to conceive of a situation in which [Emo. W.] could be physically held off the ground by a sports bra." Next, respondent seems to suggest the court erred in finding Dorantes credible because of her testimony regarding when the decision was made to take respondent's children into protective custody. Finally, respondent claims police body camera footage contradicts the court's assertion respondent failed to provide the problematic material he claimed was on Emo. W.'s phone to anyone for a significant period of time.

¶ 63    We first address respondent's claim the trial court erred in finding Emo. W. to be credible. The court's decision in this case came down to determining what happened in the hallway between Emo. W. and respondent. No one else saw what happened, but it is not disputed that respondent and Emo. W. had a physical encounter in the hallway. Emo. W. claimed respondent choked her. Respondent denied choking her. Emi. W. did not see the incident, but she testified she heard Emo. W. accuse respondent of choking her and then heard respondent essentially admit to doing so.

¶ 64    The State did not have to prove respondent abused Emo. W. by proof beyond a reasonable doubt. Instead, the State only had to prove respondent abused Emo. W. by a preponderance of the evidence. *S.R.*, 349 Ill. App. 3d at 1020. In other words, as stated earlier, the State only had to establish the allegation of abuse was more probably true than not. *A.P.*, 2012 IL 113875, ¶ 17.

¶ 65    Based on our review of the cold record, it may seem possible other trial courts may have made different credibility determinations and, as a result, found the State did not meet its burden of establishing respondent abused Emo. W. and neglected the other children. However, unlike this court, the trial court was not making its decision based on a cold record. It was able to

observe the witnesses and was in the best position to judge their credibility. See *April C.*, 326 Ill. App. 3d at 257 ("Because a trial court is in a superior position to assess the credibility of witnesses and weigh the evidence, a reviewing court will not overturn the trial court's findings merely because the reviewing court may have reached a different decision."). As a result, we will not disturb the court's adjudicatory decisions which were based on its determination Emo. W.'s version of what happened in the hallway was more credible than respondent's.

¶ 66        Turning to respondent's second argument regarding Dorantes' credibility about what transpired at respondent's house when the younger children were taken into protective custody, we note appellate courts "are entitled to have issues clearly defined and a cohesive legal argument presented." *In re Marriage of Hundley*, 2019 IL App (4th) 180380, ¶ 82. Respondent failed to present a clear and cohesive legal argument why what happened at his house when the younger children were removed is relevant to his claim the trial court erred in finding he abused Emo. W. and neglected the other children. Based on our review of the record, we fail to see why the timing of either DCFS's decision to take the children into protective custody or respondent's disclosure of what he believed was inappropriate content on Emo. W.'s phone was important to the trial court's adjudicatory decisions. Therefore, we do not address this claim further.

¶ 67        Considering the State's burden of proof, the evidence in this case, and the deferential standard of review, this court cannot conclude the trial court erred in finding Emo. W. was abused and the rest of the children were neglected.

¶ 68                                III. CONCLUSION

¶ 69        For the reasons stated, we affirm the trial court's judgment.

¶ 70        Affirmed.